JUDGE CROTTY

10 CV 7838

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOHN HILL, Individually and On Behalf of All
Others Similarly Situated,

        Plaintiff,

vs.

CHINA-BIOTICS, INC., SONG JINAN, LI CHI
YUEN a/k/a RAYMOND LI, LEWIS FAN, YAN
YIHONG a/k/a EVA YAN, and TRAVIS CAI,

        Defendants.

)  CIVIL ACTION NO.
)
)
)  CLASS ACTION
)
)
)  COMPLAINT FOR VIOLATION OF
)  THE FEDERAL SECURITIES LAWS
)
)
)
)
)  JURY TRIAL DEMANDED
)
)

RECEIVED
OCT 13 2010
U.S.D.C. S.D.N.Y.

      By and through its undersigned counsel, Plaintiff John Hill ("Plaintiff") alleges the following against China-Biotics, Inc., ("China-Biotics" or the "Company") and certain of the Company's executive officers (the "Individual Defendants"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by China-Biotics and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on China-Biotics' website concerning the Company's public statements; and (d) review of other publicly available information concerning China-Biotics and the Individual Defendants.

## I.  NATURE OF THE ACTION

1.     This is a federal securities class action against China-Biotics and certain of its officers for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities that purchased shares of China-Biotics common stock between July 10, 2008 and August 30, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     China-Biotics, together with its subsidiaries, engages in the research, development, production, marketing, and distribution of probiotics products, which contain live microbial food supplements that improve intestinal microbial balance.

3.     On August 30, 2010, Citron Research ("Citron") released a report questioning multiple aspects of the Company's business, especially the purported existence of the Company's stores and retail outlets as disclosed in filings made with the Securities and Exchange Commission ("SEC").  The information in Citron's report caused the Company's stock to fall $2.66 per share on August 30, 2010 to $12.03 per share.

4.     Plaintiff alleges that Defendants fraudulently inflated China-Biotics' stock price during the Class Period.

5.     As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.  JURISDICTION AND VENUE

6.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.      China-Biotics trades on the NASDAQ, in New York City, NY, under the symbol "CHBT", and as such venue is proper in this district.

9.      In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiff

10.     Plaintiff John Hill, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded securities of China-Biotics during the Class Period and has been damaged thereby.

### B.    Defendants

#### i.    The Company

11.     Defendant China-Biotics is a corporation incorporated under the laws of Delaware with headquarters in in the People's Republic of China ("PRC").  During the Class Period China-Biotics maintained executive offices at: No. 999 Ningqiao Road, Jinqiao Export Processing Zone, Pudong, Shanghai, 201206, PRC.

#### ii.    The Individual Defendants

12.     Defendant Song Jinan ("Song") has served as the Company's Chief Executive Officer, President, Chairman of the Board of Directors, Treasurer, and Secretary since March 2006.

13.     Defendant Li Chi Yuen a/k/a Raymond Li ("Li") served as the Company's Chief Financial Officer from the beginning of the Class Period until March 6, 2009 when he was replaced by Defendant Lewis Fan.  Li continued to work at the Company as the Vice President of Finance.

14.     Defendant Lewis Fan ("Fan") served as the Company's CFO from March 2009 until his sudden resignation effective October 21, 2009.

15.     Defendant Yan Yihong a/k/a Evan Yan ("Yan") served as the Company's CFO from October 2009 until she resigned on January 22, 2010.

16.     Defendant Travis Cai ("Cai") served as the Company's CFO from January 2010 through the end of the Class Period.

17.     Defendants Song, Li, Fan, Yan, and Cai referred to as the "Individual Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers of China-Biotics, were privy to confidential, proprietary and material adverse non-public information concerning China-Biotics, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior

executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of China-Biotics' business.

20.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through such analysts, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to China-Biotics' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of China-Biotics' securities would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of China-Biotics' publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **Factual Background**

23.     China-Biotics is engaged in the research, development, production, marketing and distribution of probiotics products in China.  Most probiotics are bacteria-based and naturally exist in the human body in the lower intestinal tract. The introduction of "helpful" bacteria and other organisms can aid in preventing infections and improve digestion.

24.     The Company's first product, Shining Essence, was launched in Shanghai in April 2001, after being approved by the Chinese Ministry of Health for production and marketing as a health product in August 2000.

25.     Shining Essence is China-Biotics' bestselling product, and represents approximately29% of sales for the year ended March 31, 2010, 40% for the year ended March 31, 2009, and 48% for the year ended March 31, 2008.  Shining Essence was also named the bestselling liver health product by The Health Food Association of China in 2001.

26.     According to China-Biotics' Form 10K filed on June 14, 2010 for the period ending March 31, 2010, the Company currently has three patents for production process, packaging design, and packaging equipment design, as well as a patent for the production of a blood cholesterol reduction product.

27.     The Company has obtained the following certifications for its production processes for Shining Essence, including: (i) ISO 9001:2008 certification from TÜV

Anlagentechnik GmbH for Shining Essence which expires in 2015; (ii) ISO 14001:2004 certification from TÜV Anlagentechnik GmbH which expires in 2013; (iii) OHSAS 18001 certification from TÜV Hong Kong Ltd, which expires in 2012; and (iv) Hazard Analysis Critical Control Point (HACCP) DS 3027 E: 1997 certification from TÜV Anlagentechnik GmbH which expires in 2012.  The Company has also obtained the Good Manufacturing Process (GMP) certification from the Shanghai Food and Drug Administration for its new production facility in Qingpu Industrial Park, which expires on March 28, 2013.

28.     China-Biotics manufactures several health supplements under the "Shining" brand in China, including the following four main retail products: (i) Shining Essence, consisting of lactobacillus acidophilus and bifidobacterium bifidum, which aims to balance the microecology of the digestive system and strengthen liver function; (ii) Shining Signal – consisting of monascus rice and lactobacillus acidophilus, which focuses on reducing high blood pressure, blood sugar, and hyperlipidemia; (iii) Shining Golden Shield, which consists of bifidobacerium adolescentis and lentinusedodes, and focuses on enhancing the body's immune system; and (iv) Shining Energy, which consists of Vitamin C, L. Arginine and amino acids, and focuses on promoting the development of brain cells, and enhancing alertness and energy.

29.     China-Biotics is incorporated in Delaware, and is currently listed on the NASDAQ under the symbol "CHBT".

**B.     False and Misleading Statements**

30.     China-Biotics has recently issued multiple false and misleading statements regarding aspects of the Company's financial operations and retail stores, all which raise significant concerns about the Company's future stability and have caused the stock price to steadily decline.

31.     The Class Period commences on July 10, 2008.  On that same day, the Company filed a Form 10-KSB with the SEC for the fiscal year ending March 31, 2008, which was signed by Defendant Song and Defendant Li, and stated:

> From March 2006, when we opened our first store in Shanghai, we have a total of 60 stores as of March 31, 2008. About three quarters of these stores are located in Shanghai and the rest are located in 5 other cities in China. We plan to have over 300 stores by March 31, 2009…

32.     The Company also issued a press release on July 10, 2008 announcing financial results for the fourth quarter and fiscal year ended March 31, 2008 which stated, in part:

> During the fourth quarter of the 2008 fiscal year, net sales increased 51.5% to $12.7 million from $8.4 million a year ago. The increase primarily resulted from significant growth in the sales of new products, most of which were sold in the Company's Shining-branded retail outlets. The sales of new products accounted for 19% of total sales in the fourth quarter of 2008, compared to 3% in the same quarter the prior year.
>
> "We concluded the 2008 fiscal year with a strong finish, continuing to achieve high growth in revenues and net income, as our combined strategy of company-owned retail stores and traditional sales through distributors was a great success," said Mr. Jinan Song, Chairman and Chief Executive Officer of China-Biotics. "We look forward to another promising fiscal year in 2009, as we remain on schedule to complete construction and begin production at our new bulk additives facility in the latter part of the 2008 calendar year. By then, we expect to become the dominant supplier of naturally occurring probiotic bacteria in China."
>
> Gross profit for the quarter increased 40.7% to $8.4 million from $6.0 million a year ago. Gross margin was 66.4% in the fourth quarter, compared to 71.5% in the same period of fiscal 2007, as a 30% increase in pulp and paper costs resulted in greater packaging costs. The Company is working with suppliers of its packaging materials to bring down such costs in the future.
>
> Operating expenses were $3.5 million, compared to $2.1 million in the fourth quarter of fiscal 2007. The increase was primarily due to setup and operations costs for new retail stores and increased salary expense stemming from new hires to support the Company's expansion.
>
> Fiscal Year 2008 Results
>
> For the 2008 fiscal year, net sales were $42.3 million, up 38.3% from $30.6 million in fiscal 2007. The sales increase was attributed to increased sales volume

and increases in average selling prices because of a change in the sales mix. Shining Essence, the Company's best-selling product, accounted for 48.6% of sales during the year, compared with 61.6% during the prior year.

Newly launched products, including Shining Essence Stomach Protection Capsules, Shining Probiotics Protein Powder and other products, accounted for 13.6% of total sales during the year ended March 31, 2008, compared to 1.9% during the prior year. The Company's Shining-branded retail stores helped to promote new products by precisely targeting existing regular customers who had benefited from taking probiotics products.

33.    In discussing the fiscal year 2008 financial results, Defendant Song stated:

With the expansion of our retail sales and bulk additives businesses, we continue to expect significant new business opportunities during the 2009 fiscal year. Same-store sales for Shining retail stores that have been in operation at least one year are expected to grow significantly year-over-year, and we hope to increase the number of Shining retail outlets to 300 by the end of March 2009.

34.    On August 14, 2008, the Company filed a Form 10-Q with the SEC, for the period

ending June 30, 2008, which was signed by Defendant Li, and stated:

We intend to expand our sales to other cities in China through a combination of distributors and our outlets (training and logistics centers).  In this regard, we intend to open over 300 outlets by the end of fiscal year 2009. As at June 30, 2008, we have opened 83 outlets in Shanghai and 8 other cities in China (as of June 30, 2007, we had 14 retail outlets). Our management believes that as China becomes more affluent, its citizens are becoming more health conscious. This has led to higher demand for health and functional food such as probiotics and yogurt.

35.    The Company issued a press release on August 14, 2008 discussing its first

quarter 2009 financial results, which stated in part:

Operating expenses increased to $3.8 million from $2.1 million in the first quarter of fiscal 2008. The increase was attributed to setup and operations costs for new retail outlets; increased salary expense stemming from new hires to support the Company's expansion;  and additional research costs associated with the development and launch of new products. As of June 30, 2008, the Company had 339 employees and operated 83 Shining-branded retail outlets, up from 208 employees and 14 Shining outlets on June 30, 2007.

36.    In discussing these first quarter 2009 financial results and overall business

outlook, Defendant Song stated:

As our retail and bulk additives businesses continue to expand, we are managing our capacity utilization carefully to strike a balance between achieving current and future sales growth. We are pleased that we were able to begin achieving meaningful sales of our bulk additives to commercial customers. We are also working on rolling out new retail outlets as quickly as we can. Those outlets already open more than one year have demonstrated tremendous year-over-year sales growth, and we believe that, in time, the retail strategy will contribute significantly to our growth.

37.     On November 10, 2008, the Company filed a Form 10-Q with the SEC for the period ending September 30, 2008, which was signed by Defendant Li and stated:

In connection with the expansion of our retail business, we originally intended to open 300 outlets by the end of fiscal year 2009. As at September 30, 2008, we have opened 110 outlets in Shanghai and 12 other cities in China (as of September 30, 2007, we had 22 retail outlets in Shanghai and Changchun). In the last two quarters, we have accelerated customer acquisition efforts and dedicated a significant amount of management efforts and production capacity for this purpose. With the limited production capacity that we have in our existing production facility, management believes that it is prudent to slow the pace of opening new retail outlets so that we can focus on completing the new plant on time and signing on customers to take up the capacity of our new plant when it is up and running. We now intend to open 300 outlets during fiscal year 2010.

38.     The Company issued a press release on November 11, 2008 discussing the financial results for the second quarter of 2009, which stated in part:

During the second quarter of the 2009 fiscal year, net sales increased 47.0% to $11.5 million from $7.8 million the prior year, as a result of growth in the sales volume of new products and increases in the sales price of selected products. Sales also benefited from an increase in the number of the Company's Shining retail outlets to 110 from 22 the prior year. New products, including Shining Essence Stomach Protection Capsules, Shining Probiotics Protein Powder and other products accounted for 16.3% of total sales during the quarter, up from a combined 4.0% a year ago. Sales of bulk additives to commercial customers totaled $1.4 million, or 12.2% of sales, during the second quarter of 2009, up from $1.0 million, or 8.8% of sales, during the fiscal first quarter. There were no bulk additives sales in the second quarter the prior year.

*****

Selling expenses increased to $2.8 million, or 24.5% of sales, from $1.6 million, or 20.0% of sales, in the second quarter a year ago, as the Company significantly increased the number of retail outlets. General and administrative expenses

increased to $1.4 million, or 12.5% of sales, from $1.1 million, or 13.9% of sales, in the second quarter of fiscal 2008. The increase was primarily related to $0.3 million of additional research costs to develop and launch new products and staff and administrative costs incurred in connection with the construction of the new manufacturing facility. As of September 30, 2008, the Company had 339 employees and operated 110 Shining- branded retail outlets, up from 266 employees and 22 Shining outlets on September 30, 2007.

*****

With limited capacity in its existing production facility, management believes it is prudent to proceed with the retail outlet expansion at a measured pace, which will enable the Company to focus on the completion of the new manufacturing facility and signing on customers to fill production capacity once the new facility becomes operational. As a result, the Company's plan to open a total of 300 Shining retail outlets is expected to be completed in the 2010 fiscal year.

39.    In discussing the financial results for the second quarter of 2009, Defendant Song stated:

We are delighted to see continued revenue growth in the second quarter, as we benefited from strong volume and price increases in our retail business and increased demand from our existing bulk additives customers.  Our Shining retail outlet expansion resulted in an additional 27 openings during the quarter and should result in increased profits during the second half of the fiscal year. As we prepare for the completion of our new manufacturing facility, we are carefully balancing existing production capacity between our retail expansion and bulk additive business development. We signed one new bulk customer during the second quarter, and we remain in negotiations with more than 100 potential business clients.

As we look to the second half of the year, we continue to make great progress in our retail expansion strategy, and we expect that our new manufacturing facility will come online during the fiscal third quarter.  We now have 22 Shining outlets that have been open at least one year, and all of these have demonstrated very strong growth year-over-year. As we accelerate our rollout of Shining outlets, we expect a significant increase in selling expenses. However, sales from existing outlets should help to offset increased expenses, as 60% of our retail sales typically occur during the second half of our fiscal year. The bulk additive business should continue to expand, as our new facility becomes operational and we are able to take on additional orders.

40.    On February 13, 2009, the Company filed a Form 10-Q with the SEC for the period ending December 31, 2008, which was signed  by Defendant Li, and stated:

11

We intend to expand our sales to other cities in China through a combination of distributors and our outlets (training and logistics centers). Our management believes that as China becomes more affluent, its citizens are becoming more health conscious. This has led to higher demand for health and functional food such as probiotics and yogurt.

*****

In connection with the expansion of our retail business, we originally intended to open 300 outlets by the end of fiscal year 2009. As at December 31, 2008, we have opened 107 outlets in Shanghai and 12 other cities in China (as of December 31, 2007, we had 27 retail outlets in Shanghai and Changchun). In the last three quarters, we have accelerated customer acquisition efforts and dedicated a significant amount of management efforts and production capacity for this purpose. With the limited production capacity that we have in our existing production facility, management believes that it is prudent to slow the pace of opening new retail outlets so that we can focus on completing the new plant on time and signing on customers to take up the capacity of our new plant when it is up and running. We now intend to open 300 outlets during fiscal year 2010.

41.     The Company issued a press release on February 16, 2009 discussing the financial

results for the third quarter of 2009, which stated in part:

During the third quarter of the 2009 fiscal year, net sales increased 32.5% to $15.8 million from $11.9 million the prior year. Growth in revenues stemmed from increased sales volume of new products and changes in the Company's sales mix, as China-Biotics reaped the benefits of ongoing, targeted price increases on selected products. Compared to the prior year, sales also benefitted from an increase in the number of the Company's Shining retail outlets to 107 from 27 in the fiscal third quarter a year ago. Newer products, including Shining Essence Stomach Protection Capsules and Shining Probiotics Protein Powder, accounted for 19.6% of total sales during the quarter, up from a combined 13.1% of sales a year ago. Sales of bulk additives to commercial customers totaled $1.1 million, or 7.1% of sales, during the third quarter of 2009, up from $0.1 million, or 1.2% of sales, during the third quarter of 2008, as the Company continued to generate orders from agreements with new customers and expand production to fill orders from existing customers.

*****

Management continues to balance current capacity against future sales growth and expects to resume the expansion of its Shining retail outlets at a moderate pace. This should enable the Company to concentrate on the completion of the new manufacturing facility and the addition of new bulk additives customers to fill production capacity once the facility begins operations. The Company remains confident in its plan to open a total of 300 Shining outlets during the 2010 fiscal year.

12

42.     In discussing the third quarter 2009 financial results, Defendant Song stated:

We again achieved solid sales and profit growth during the third quarter, as our bulk additives and retail expansion strategies continued to generate strong results. During the quarter, we continued to balance current demand against future sales growth, adjusting our product pricing to maximize production capacity. We focused on fine-tuning our Shining retail outlet operations, closing one unproductive location and two sites where the Shanghai government is engaged in urban redevelopment. On the bulk additives side of the business, we added six additional food customers during the quarter, and we remain in negotiations with more than 100 potential business clients.

We continue to make progress in both the retail and commercial aspects of our business, with 107 Shining retail centers and eleven bulk additives customers. We look forward to finishing the 2009 fiscal year in strong fashion, as the third and fourth fiscal quarter are typically our seasonally strongest, producing 60% of retail sales.  We also resumed construction of our new manufacturing facility following the Chinese New Year holiday, and we remain on track to complete the project in April.

43.     On July 14, 2009, the Company filed a Form 10-K with the SEC for the fiscal year ending March 31, 2009, which was signed by Defendant Song and Defendant Fan, and stated:

As at March 31, 2009, we have opened 106 outlets in Shanghai and 12 other cities in China.

In preparation for the opening of additional retail outlets, we have also been actively recruiting and training retail sales staff since the beginning of 2006. We have already successfully recruited a number of very experienced sales professionals and have trained a pool of sales staff. We have also designed and implemented control systems to manage this new business.

Currently, we have a network of 106 outlets in China. We continue to survey cities in China to assess and select suitable locations for new outlets.

As part of our strategy, we will also consider licensing franchisees to operate retail outlets in due course. We intend to finance the costs of our business expansion by our internal working capital.

44.     The Company issued a press release on July 15, 2010 discussing the financial results for the fourth quarter and fiscal year 2009, which stated in part:

During the fourth quarter of the 2009 fiscal year, net sales increased 18.9% to $15.5 million from $13.1 million a year ago. The increase resulted from significant growth in the sales of new products, most of which were sold in the Company's Shining-branded retail outlets, and growth in the bulk additive business. The Company's established retail outlets and well-trained sales assistants contributed to the rapid revenue growth from new products through its customer-oriented sales model and establishment of the Community Network, which provides health education and probiotics-related seminars to health-conscious consumers in the middle and high income levels.

45.     In discussing the financial results for the fourth quarter and fiscal year for 2009, Defendant Song stated:

Same-store sales for Shining retail stores that have been in operation at least one year are expected to grow significantly year-over-year, and we hope to continue to expand the number of Shining retail outlets during the year. Although global economic growth remains suppressed, we believe there is pent-up demand for our bulk additive products, which should generate substantial growth in revenues and net income during the 2010 fiscal year.

46.     On August 14, 2009, the Company filed a Form 10-K with the SEC for the period ending June 30, 2009, which was signed by Defendant Song, and stated in part:

In connection with the expansion of our retail business, we originally intended to open 300 outlets by the end of fiscal year 2009. As at June 30, 2009, we have opened 107 outlets in Shanghai and 12 other cities in China (as of June 30, 2008, we had 27 retail outlets in Shanghai and Changchun). During the quarter ended on June 30, 2009, we put emphasis on the development of our new bulk additives line, in preparation for the commencement of the new plant. With the limited production capacity that we have in our existing production facility, management believes that it is prudent to slow the pace of opening new retail outlets so that we can focus on completing the new plant on time and signing on customers to take up the capacity of our new plant when it is up and running.

47.     The Company issued a press release on August 17, 2009 discussing its first quarter 2010 fiscal results, which stated in part:

During the first quarter of the 2010 fiscal year, net sales increased 35.5% to $15.4 million from $11.4 million a year ago. The increase resulted from an increase in sales volume from new products, most of which were sold in the Company's Shining-branded retail outlets, significant growth in the bulk additive business and sales price increases on bulk additives products.

48.     In discussing the financial results for the first quarter of 2010, Defendant Song stated:

> We look forward with anticipation to the remainder of fiscal 2010. Our new manufacturing facility remains on track to begin trial production in the second quarter of fiscal 2010, as previously announced, and our pipeline of potential new bulk additives customers continues to be strong.
>
> As the new capacity comes online, we will be able to resume our Shining retail outlet expansion later in the fiscal year. We are already directing our attention to the second phase of the capacity expansion, which we expect to begin by December 31, 2009. Although global economic growth remains suppressed, demand for our bulk additive products has been significant. This should result in revenue growth of at least 50% during the 2010 fiscal year.

49.     On November 16, 2009, China-Biotics filed a Form 10-Q with the SEC for the period ending September 30, 2009, which was signed by Defendant Song, and stated in part:

> As at September 30, 2009, we have opened 107 outlets in Shanghai and 12 other cities in China (as of September 30, 2008, we had 110 retail outlets). During the quarter ended on September 30, 2009, we put emphasis on the development of our new bulk additives line, in preparation for the commencement of the new plant. With the limited production capacity that we have in our existing production facility, management believes that it is prudent to slow the pace of opening new retail outlets so that we can focus on completing the new plant on time and signing on customers to take up the capacity of our new plant when it is up and running.

50.     The Company issued a press release on November 17, 2009, discussing financial results for the second quarter of fiscal year 2010, which stated in part:

> Operating expenses were $4.6 million, compared to $4.2 million a year ago. The increase in operating expenses during the second quarter of fiscal 2010 was primarily due to an increase in legal and professional fees associated with preparation for public offerings. Selling expenses for the second quarter of 2010 were $2.7 million, or 15.9% of sales, down from $2.8 million, or 24.5% of sales, in the year ago period. The decline in selling expenses was the result of the closure of three Shining retail outlets in early 2009 calendar year due to local community redevelopment.
>
> *****
>
> In October, China-Biotics completed an underwritten public offering of 5,290,000 shares of its common stock at a price of $15.00 per share, including the exercise

of the underwriters' over-allotment option, generating net proceeds of approximately $75.4 million. The Company expects to use the net proceeds from the offering for general corporate purposes, including expanding its retail operations, expanding its products, acquiring additional retail outlets and for general working capital purposes.

51.     In discussing the Company's financial results for the second quarter of fiscal year

2010, Defendant Song stated:

We look forward with anticipation to the remainder of fiscal 2010 and are excited about the traction we are gaining in our bulk additives business. Our new manufacturing facility is expected to begin commercial production in the first quarter of calendar year 2010, and our pipeline of potential new bulk additives customers continues to be strong.  As the new capacity comes online, we will be able to resume our Shining retail outlet expansion later in the fiscal year. We are already directing our attention to the second phase of the capacity expansion, which we expect to begin by December 31, 2009. Demand for our bulk additive products has been significant, which should result in revenue growth of at least 50% during the 2010 fiscal year."

52.     The Company issued a press release on February 10, 2010 discussing financial

results for the third quarter of fiscal year 2010, which stated in part:

Operating expenses were $6.4 million, compared to $4.7 million a year ago. As of December 31, 2009, the Company had a total of 111 retail outlets in operation compared with 107 outlets as of December 31, 2008.

53.     In discussing the financial results for the third quarter of fiscal year 2010,

Defendant Song stated:

We will continue to seek a balance between current production capacity and sales to new customers until our new facility begins commercial production. We look forward to the continued expansion of our retail distribution network and outlets. Once the Qingpu facility comes online, we will have the capacity to accommodate new orders as scheduled, which will begin contributing to our financial results in the fourth quarter of fiscal 2010.

54.     On February 11, 2010, the Company filed a Form 10-Q with the SEC for the

period ending December 31, 2009, which was signed by Defendant Song and stated in part:

As at December 31, 2009, we have opened 111 outlets in Shanghai and 12 other cities in China (as of December 31, 2008, we had 107 retail outlets). During the quarter ended on December 31, 2009, we put emphasis on the development of our

new bulk additives line, in preparation for the commencement of the new plant. With the limited production capacity that we have in our existing production facility, management believes that it is prudent to slow the pace of opening new retail outlets so that we can focus on completing the new plant on time and signing on customers to take up the capacity of our new plant when it is up and running.

55.    China-Biotics issued a press release on June 11, 2010 discussing financial results for the fourth quarter fiscal year 2010 and annual results for fiscal year 2010.  In commenting on these results, Defendant Song stated:

> With our established state-of-the-art facility in Shanghai and our growing capacity utilization, we believe that we are well positioned to ride the wave of rising market demand and increasing government support for probiotics. We will continue to broaden our distribution network as well as diversify our retail portfolio through launching new products. We also look forward to winning more bulk customers as we have received encouraging feedback from potential customers during the initial trial period.

56.    On June 14, 2010 the Company filed a form 10-K with the SEC discussing financial results for fiscal year 2010 ended March 31, 2010, which was signed by Defendant Song and Defendant Cai, and stated:

> We intend to expand the sale of our retail products to the other metropolitan cities in China through a combination of traditional distribution channels and dedicated Shining outlets. We have a total of 111 outlets as of March 31, 2010. About three quarters of these outlets are located in Shanghai, and the rest are located in 12 other cities in China. With respect to our bulk additives business, we have secured 31 bulk additives probiotics customers nationwide in tier-one urban areas such as Beijing and Shanghai, as well as inland provinces such as Qinghai and Inner Mongolia…

57.    On August 9, 2010, the Company filed a Form 10-Q with the SEC for the period ending June 30, 2010, which was signed by Defendant Song and Defendant Cai, and stated in part:

> As of June 30, 2010, we have 27 distributors for retail products, and we are operating 103 retail outlets in China (as of June 30, 2009, we had 107 retail outlets).  During the quarter ended June 30, 2010, we added 1 distributor for retail products and closed 8 retail outlets, as we believe selling retail products through

our distribution network is a more efficient way to grow our retail market. We have been hiring consultants who have many years of experience in the direct selling industry to facilitate the development of the Shining brand outlets. We are also creating a "Community Network" through which we continuously provide training and seminars to educate the public about becoming more health conscious and about the benefits of probiotics and the Shining products.

## C.   **The Truth Comes To Light**

58.     The Company's aforementioned statements are false and misleading because, as seen in Citron's report and by comparing China-Biotics' filings with Chinese authorities to its SEC filings, the Company's highly-touted "retail outlets" and "stores" do not in fact exist.

59.     The Company signaled that problems were imminent, as it filed a Form 12b-25 with the SEC on June 29, 2009, stating that it would not be able to file its Annual Report Form 10-K for the fiscal year ended March 31, 2009 on time. The Form 12b-25 stated, in part:

> China-Biotics, Inc. (the "Company") will be unable to file its Annual Report on Form 10-K for the fiscal year ended March 31, 2009 (the "Form 10-K") within the prescribed time period without unreasonable effort or expense. The late filing is due to delays in the review and confirmation of back-up materials and supporting documentation required by the Company's auditors in order to finalize the audit of the Company's financial statements.

> The Company expects to file the Form 10-K as soon as practicable after audit has been finalized, which the Company expects will be no later than July 14, 2009.

60.     After this announcement on June 29, 2009 the Company's stock fell from $16.35 per share to $12.22 per share, and on June 30, 2009 the stock fell again to $10.80.

61.     On September 30, 2009, the Company issued a press release announcing that it had priced a public offering of 4.6 million of its shares of common stock at $15.00 per share, which totaled approximately $69 million overall (the "September 2009 Offering"). In discussing the purpose of the September 2009 Offering, the press release stated, in part:

> The Company expects that the offering will yield net proceeds, before expenses, of approximately $65,550,000 million and intends to use the net proceeds from the sale of the securities for general corporate purposes, including expanding its retail operations, expanding its products, acquiring additional retail outlets and for

general working capital purposes. "We are pleased to execute this public offering, and intend to use the proceeds to further enhance and develop our business," said Mr. Jinan Song, Chairman and Chief Executive Officer of China-Biotics.

Roth Capital Partners, LLC, acted as the sole manager of the offering. In connection with the offering the Company also granted the underwriters a 30-day option to purchase up to an additional 690,000 shares to cover over-allotments, if any. The offering is expected to close on or about October 5, 2009.

62.     On October 5, 2009, the Company issued another press release stating that the

September 2009 Offering had closed, and had resulted in net proceeds of $65.5 million after

deduction of underwriting discounts and commissions.  This release stated in part:

China-Biotics anticipates using the net proceeds from the offering for general corporate purposes, including expanding its retail operations, expanding its products, acquiring additional retail outlets and for general working capital purposes.

Roth Capital Partners, LLC, acted as the sole manager of the offering.

63.     China-Biotics issued a press release on October 23, 2009, which announced that is

CFO, Defendant Fan, was resigning:

SHANGHAI, Oct. 23 /PRNewswire-Asia/ -- China-Biotics, Inc. (Nasdaq: CHBT) ("China-Biotics", "the Company"), a leading Chinese firm specializing in the manufacture, research, development, marketing and distribution of probiotics products, today announced that Lewis Fan has resigned as Chief Financial Officer in order to pursue other professional interests. Mr. Fan had no disagreements with the Company in regard to its financial statements or accounting matters. His resignation was effective October 21, 2009.

The Company is currently searching for qualified candidates to replace Mr. Fan. Ms. Eva Yan, Chief Administration Officer and a director of Shanghai Shining Biotechnology Co. Ltd., a subsidiary of China-Biotics ("Shining"), will serve as interim Chief Financial Officer until a successor is named.

"Mr. Fan has been a valuable member of our team and I would like to personally thank him for his contribution as Chief Financial Officer," said Mr. Jinan Song, Chairman and Chief Executive Officer. "He was chiefly responsible for our successful recent public offering and his input and experience have been invaluable in our success this year. We wish him well in his future endeavors."

64.     After the announcement of Defendant Fan's resignation, the Company's stock price fell $2.00 per share to $14.42 on October 23, 2009.  The price fell again by $0.72 on October 26, 2010.

65.     On August 30, 2010, Citron issued a report which called into question the Company's disclosures regarding its retail outlets and stores.  This report stated the following:

**It Doesn't Take a Microscope to See What's Wrong with China-Biotics (NASDAQ:CHBT)**

**Citron Probes the Obvious:  Where are the Stores?**
Amazing how fraud is like water, it just finds the path of least resistance.  When Citron started this column nine years ago this week, the frauds were OTCBB stock promotions run out of boiler rooms.  The progressed to internet campaigns and mailers, and now most recently to the greatest promotion of 'em all: CHINA.   In this past weekend's Barron's Magazine, Bill Alpert does a fine job in describing the web of fraud that exists in small cap Chinese stocks that were brought to market via reverse merger.

http://online.barrons.com/article/SB50001424052970204304404575449812943183940.html?mod=BOL_hpp_mag

In the article, Barron's observes:
***"The SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S. Many reverse-merged companies admit in prospectuses that they haven't gotten required approvals under China's financial regulations."***

Citron has written about a reversed merged China stock in 2007  (Xinhua Finance Media NASDAQ:XFML).  When we published, it was $10.00 and now it is .18 cents (ticker now XSEL).  After reading this weekend's Barron's, we thought we would share the interesting case of China-Biotics as it seems so timely and relevant.

While the world "biotics" might sound impressive, it really is nothing more than a food supplement that in this case comes in the form of an acidophilus pill. Worldwide, there are literally dozens of manufacturers of the bacteria concentrate in these supplements.  It is a mature and stable low-margin industry.

We could probably write 10 pages on what stinks about this China Biotics and what raises the red flags for fraud.

- It would be easy to look at the gross discrepancies between the company's SAIC and SEC filings.
- It would also be possible to show pictures of the half-finished over-budget manufacturing facility side-by-side with company claims that it was already in production, or the photos of their current production facilities the size of a "bathroom" where the acidophilus pills drop out of a machine two by two.
- Most compelling, it would be simple to question how a company who sells the bulk of their product though distributors, who then purportedly resell them to Wal Mart (so they claim) can generate EBIDTA margins of 40-45% when their competition is at 27% max. (Multinational companies in the business include Danisco, Yakult, Perrigo, Cargill and others.) The company claims its high margins are due to its "retail channel".
- Or, as if one needs any more of a red flag, we could discuss how the company has been through 5 CFOs in only 4 years:

| CHBT CFO History | Start Date | End Date |
|---|---|---|
| Song Jinan | 3/22/2006 | 11/13/2006 |
| Li Chi Yuen (Raymond) | 11/13/2006 | 03/06/2009 |
| Lewis Fan | 03/06/2009 | 10/21/2009 |
| Yan Yihong (Eva) | 10/21/2009 | 01/22/2010 |
| Travis Cai | 01/22/2010 | Present |

- We could discuss the company's $50 million plus financial commitments due in 2010 or its looming potential tax liability from questionable past financial transactions that could also be as high as another $50 million.

But all of those arguments would either require Citron to prove a negative or use arguments of inference. Or it would require shareholders to actually use some form of skepticism and analytics when judging the numbers. So instead we will ask an easy question that the company and shareholders should have no problem answering:

**China-Biotics  -  Where are your stores?????**

According the CHBT's SEC filings,
*"As of March 31, 2010, we had 111 Shining branded outlets in Shanghai and 12 other major cities in China where we sell our products directly to the end users."*

Below is a chart showing the company's alleged retail store growth since the company completed its reverse takeover in March 2006.



CHBT disclosed that "about three quarters of these outlets are located in Shanghai and the rest are located in 12 other cities in China." As a result, we should expect that the company has at least 70 outlets in Shanghai.

Amazing that a company that is not at all shy in its use of PR's had this explosive store growth without one: ribbon cutting, new store pr, or notice of opening.

Extensive web searches through http://map.baidu.com/ http://shanghai.aibang.com/ , and http://www.mapbar.com/ using the company's disclosed brand names reveal only a handful of stores.  We can find only 6 or 7 stores in Shanghai, and one each in Xeitu, NanMatou, Jingyu, Zhang YangLu, LingNan, FengZhuang.

In going through the corporate filings, it appears that the company's retail outlets go under the brand            .  That is also the name that we can see on the sign of the few stores that we actually could identify.  Put that into http://map.baidu.com/   and see if your results differ.

Citron has heard from a handful of investors who all report that they have been unable to find any sign of even 25 locations, let alone over 100.

The company claims there are more than 100 retail outlets, with at least 70 of them in Shanghai. Proving that should be fairly easy: management should simply publicly disclose the addresses for every one of the company's retail outlets.

Since a picture is worth a thousand words, here's a look at the store China-Biotics identifies as its "flagship".  There's very scant inventory, but a lot of photos of what looks like a sales meeting for an MLM organization, a business model the company denies being a part of.   Yet the excuse made by the proprietor of this store for the obvious lack of sales is that "most of the sales are generated through a 'buying club' ".

*****

22

OK, OK … those used to our stringent US disclosure standards may be asking…"What about the auditors..– certainly they have seen or have knowledge of all of the stores, no ? "

The auditors of CHBT are BDO Limited…..who should not be confused with BDO Seidman, as all they really share with that big-name firm are 3 letters in their name as explained in this article by China Company Analyst. http://seekingalpha.com/article/213213-orient-paper-not-all-bdos-are-the-same

BDO seems to have become the auditor du jour for questionable Chinese public companies.

"Well Citron, what about just going to the corporate website and getting the locations there?"

You do it.  If you try it on one of those days where the corporate website actually works ( http://www.chn-biotics.com/ ), you will not find a list of store addresses. How can any company claiming to be in the retail business (with over 100 stores) not even list store locations on their site…anyone, anyone??

**Conclusion**
Investors need to be wary of the growing scrutiny that Barron's and other investigative reports will bring upon these shenanigans.  Citron doesn't believe the current regulatory "enforcement-free zone" for US-listed China-based companies is in the best economic interests of either the US or China, and it is not sustainable.

Within China, the country's credibility in the international marketplace is regarded as a national strategic priority.  It may seem that China's culture has different standards when it concerns of questionable business ethics, but when the state becomes aware of a real economic threat, they come down hard.  Just look at what happened to the CEO's of companies involved in the melamine in milk scandal, the lead in toys scandals, etc.  Its no wonder that the first sign a US investor may get of trouble in a Chinese company is when the CEO "disappears".

**There's no need to get embroiled in "shorts vs longs" battleground rhetoric here.  It's a very simple matter: where are the stores?  If there are no stores, there's no margins, no profit and nothing credible about this company or its management to hang an investment thesis on….period.**
Alpert's article shows how bad the odds are for investors in these poorly documented and regulated reverse-merger entities.  But at the bottom of the class is a company whose entire operation is based on fiction.

**Cautious investing to all.**

66.     As a result of Citron's report, on August 30, 2010 the Company's stock fell $2.66 per share to $12.03 per share.

67.     On August 31, 2010, Citron continued questioning the veracity of China-Biotics' disclosures regarding its retail outlets and stores, in another report, which stated:

**"Where are the stores ?"  Update August 31, 2010…Either the Company does not know how to communicate…or it is a fraud.  You decide.**

China Biotics (NASDAQ:CHBT) is out with a response to Citron's report of yesterday, in which we questioned the accuracy and credibility of the company's disclosures.  The company is hosting an "Investor Day" in Shanghai "by reservation only".  Citron suggests that this event is unlikely to produce credible answers needed to tough questions about all the aspects of this company's disclosures that don't line up with reality.

More significantly, the company for the first time posted a list of locations when its corporate website returned to service today. http://www.chn-biotics.com/c4426/c4435/default.html

Citron can't help but conclude the newly posted list of locations is in response to our publicly posted challenge yesterday.

The problem is, here's what the company says about its retail locations:

From China Biotics 10-K
*"As of March 31, 2010, we had 111 Shining branded outlets in Shanghai and 12 other major cities in China. We have been hiring consultants who have many years of experience in the direct selling industry to facilitate the development of new Shining brand outlets."*

The company states it is expensing $3.9 million US annually for its tiny office and production facilities, plus, presumably the retail locations it describes above: *"Rental expense, which was charged to expense, amounted to $3,906,098, $3,363,300, $990,300 for the years ended March 31, 2010, 2009 and 2008, respectively."*

Elsewhere it states it employs 232 retail outlet employees.
You would assume that this kind of expense and employee footprint is commensurate with a 100-branch retail network, no?  Something matching the classy photo of the yogurt shop they show here, right?



**Well, it appears the majority of the 100 locations they just published are <u>not</u> in fact leased company stores, but are locations of supermarkets, mostly located around the greater Shanghai area.**

For example, their first listed location , 62 Wensu Road, Jiading District, is this Jiadeli Supermarket, a chain of over 140 stores. http://icexpat.com/nm_AddressDetails;mid_3711366A2FD34ABF824EA1F0A7FF6014.shtml

Further down the page is "Jiading District, 420 Yumin Road"  This is Jiadeli Supermarket #59.

http://www.icexpat.com/nm_AddressDetails;mid_62F4670E393C478E967D3751049F748F.shtml

At least 10 other locations listed on the company's website are found on this single listing of Supermarkets in the greater Shanghai metro area: http://webcache.googleusercontent.com/search?q=cache:z6eRGG1ewnwJ:chinauniquetour.com/html/Shanghai/2009423/arts-5808.html+88+Baode&cd=5&hl=en&ct=clnk&gl=us

For example, look at 1538 Caoan , 501 Sanmen Road, 1557 Yunchuan, 8991 Nanfeng, 1218 Wuzhong, 88 Baode, 3155 Qixin Road. 1500 Xincun, 1688 Tongchuan,  Lane 133 Linping,  8 Baoming etc., etc.

Research is ongoing, but it appears the company is being intentionally misleading in these disclosures.  Shelf space in a supermarket does not equate to a freestanding retail location, period.  They have had ample opportunity to respond to a simple question and this is their answer.  This only leads to more troubling questions, such as: "Where is the money really going?  Where are the 232 employees stationed?  Why post huge capital commitments to the animal feed business, with obviously far lower margins ?  Why scurry away from the retail business after making such a big deal about its retail network?

**Conclusion**

There is no such thing as "half a lie" when it comes to public company disclosures. It simply leads to deeper questions about every aspect of the company's integrity. Citron reminds investors of the regulatory gap that allows Chinese companies with US listings to live in the margins, held accountable by neither Chinese authorities nor the SEC.

Sorry folks. This one is a recipe for indigestible investor losses. The company is now caught in a web of its own deception, and will be greatly challenged to square its disclosures with verifiable data points. On the financial side, its claims of a stock buyback plan and a huge cash hoard are inconsistent with its capital-raising activities. Its reported gross margins do not square with its recent production capacities, and its gross revenues are inexplicably high related to its peers in the industry. Its SEC and AIC financial reporting profile two entirely different realities.

**Cautious Investing to All**

68.    On September 10, 2010 China-Biotics issued a press release responding to

Citron's report, which stated:

**China-Biotics, Inc. Comments on Market Rumors**

SHANGHAI, Sept. 10 /PRNewswire-Asia-FirstCall/ -- China-Biotics, Inc. (Nasdaq: CHBT) ("China-Biotics" or "the Company"), a leading developer, manufacturer and distributor of probiotics products in China, today confirms that there has been an organized effort to distribute false rumors regarding the Company by emails, phone calls and websites. The Company suspects this is motivated by short selling interest in the Company's stock. These messages are false and damage China-Biotics' corporate image and its management's credibility. The Company has acted in a legal and ethical manner and it has not provided false disclosures of the Company's operations or financial data to investors or the United States securities authorities. China-Biotics is working with its legal counsel and the relevant authorities on further action against those responsible.

69.    On September 14, 2010 Citron published a third report questioning the

Company's operations, and providing additional information concerning China-Biotics, which

stated:

China Biotics (CHBT) is a Fraud – Now sue Citron- We Dare You.
Posted in Citron Reports by CitronResearch on the September 14th, 2010

Yesterday, DYP and DGW were the number 1 and 2 losers in the market **declining 54% and 41%** respectively. This only shows the fragility and lack of transparency that exists with small cap Chinese companies. Citron will prove that China Biotics does not just lack transparency, but rather it is an outright fraud



Citron Research has been writing about stock fraud for over 9 years. In that time, we uncovered numerous frauds that have subsequently been delisted and management charged by the SEC. Yes, we have made mistakes in the past, as have even the best researchers, but we have **NEVER been wrong about a fraud.**

**With that, Citron is confident to state "China Biotics is a fraud"  If we are lying, then please sue us and we will prove it in court.  Or, put out a press release defending yourself and explicitly blame Citron Research, and we will sue you proactively to prove that you are committing securities fraud on the investing public.**

We do not use the fraud word lightly, but frauds have a certain way of playing out, and sure enough CHBT management is following along right with the script. You don't have to be Sherlock Holmes or even Encyclopedia Brown to figure this one out.

**The curious case of the missing stores and the ol' switcheroo trick.**
Two weeks ago in our first article, Citron questioned the "network of stores" that are claimed by CHBT – the same stores referenced in years' worth of SEC filings, but are also discussed in every analyst report.  More importantly, the stores that investors relied upon when they forked over $75 million for shares.  **Citron does not believe that Roth Capital intentionally tried to defraud the public**, rather they became collateral damage.   In the second line under use of proceeds, the registration statement states "to expand our retail operations".
Once we questioned the stores existence, CHBT immediately put on their website a list of the "branded stores" as they state in their SEC filings.

Within hours Citron was able to determine that these were not their stores, 95% of them were just supermarkets and retail outlets.  We took it a step further and hired two private investigators to take pictures and prove what we knew.  Once we brought that to the attention of the investing public, the company changed their website again **to eliminate the word "stores"**…a play right out of the scamsters' handbook.  They also **eliminated** the line "The Company's most recognizable customers include Bright Dairy, and Relax Xinqiao." Why?  Now it just says "the following is a list of sample locations where you can find our product."
http://www.chn-biotics.com/c4426/c4435/default.html

27

Just to remove any doubt about "what they said" and "what they meant", reference the company's June 2010 investor presentation: http://www.chn-biotics.com/files/CHBT%20June%202010.pdf

*Page 4, bottom:  China-biotics operated 111 retail outlets as of March 31, 2010, each outlet has an average payback of less than one year."*

Where are the stores?  Where is the money that goes to salaries and leases for these stores?  Whose pockets is it in???   Did we mention this is a fraud??

**The curious case of the missing money… check this out.**
**When you put money in the bank you get interest… DUH.**

China Biotics claims its cash in the bank is $159.7 million in the bank, according to its June 30 SEC filing – every dollar of which is supposedly available for corporate purposes. **Yet it reports interest of just $87,876.  So where is the interest?** How can the company be earning interest of less than 1/10th of comparable companies?  Companies with large cash balances earn interest. Interest rates on free cash balances in China earn 1% for 3 month to 1 year term deposits, and 2% for 1 to 2 year term deposits.
Simple math tells us that at 1% interest the cash should generate $400,000 per quarter in interest income.  At 2% this same cash balance should generate $800,000 per quarter.

So either the company is only getting 1/10th the interest rate that it should be getting in china, or 90% of the money is not IN THE BANK.  One would assume that the company is using some of the funds for working capital and to build out its new operations. **However the SEC filing states that it is all in the bank!**

CHOP earned $278,000 (1.44%) interest on $77.3 million in the last quarter.

XIN earned $554,000 (1.33%) interest on $166 million in the last quarter

CAGC earned $171,000 (1.32%) interest on $51.7 million in the last quarter.

**Even Orient Paper earned $108K (1.55%) interest on its $7 Million cash in 2009…**

**The curious case of the conflicting financials**
A great debate is now ongoing about disclosure documents filed in China and those filed in the US.  Citron has read the "plausible deniability" explanations from Roth and others about how variations in rollups and tax treatment might make for a partial misalignment of the numbers in these reports.  Other claims, such as fear of disclosing corporate secrets to competitors, seem nonsensical and downright moronic as anyone has free access to SEC documents.

The numbers are not just off because of different GAAP standards or maybe some accounting practice, the difference between the two is as wide as the Great Wall. Just take a look.

| 2008 Filings Disclosures | SAIC | SEC |
|---|---|---|
| **Cash** | 100,000 | 64,300,000 |
| **Accounts Receivable** | 1,000,000 | 13,200,000 |
| **Revenues** | 500,000 | 42,300,000 |
| **Gross Profits** | 200,000 | 30,000,000 |
| **Net income** | (1,200,000) | 17,500,000 |

Now the "longs" or in this case people who are about to apologize to Citron will argue that these are not audited and the company is lying to China and telling the truth to US regulators and the investing public.

LOLOL

CHBT's SAIC filings **are audited**.  Just go to page 80 of the filings and you will see the audit report of a top 100 Chinese accounting firm. http://chinesecompanyanalyst.files.wordpress.com/2010/08/chbt-aic-filings-in-english-translated2.pdf

And as for lying to the Chinese Government but not the SEC, you want us to believe that management who lives and pays taxes in China, where white collar crime can be punishable by death, will lie to the Chinese Government but they will not lie to the SEC?  And why are we supposed to believe this ?  C'mon … if only the stock market was always this easy.

The fate of CSKI is an interesting tell.  That company too had massive discrepancies between SAIC and SEC disclosures.  Now, the company finally confesses that "some distributors", under pressure from Chinese regulators, suddenly don't want to play ball, a resigned CFO, an ugly restatement, a formal investigation and subpoena from the SEC, and a 50% haircut later, reality has extracted its price … on the suckers.  Good luck suing 'em now.

**The Company's Response**
Well heck, they had to say something.  On Friday September 10, the company released a statement commenting on their stock. http://finance.yahoo.com/news/ChinaBiotics-Inc-Comments-on-prnews-1108787132.html?x=0&.v=62

In it they don't defend their alleged stores claim explicitly.  Instead they state that there are "market rumors".  Where are the rumors?? These are facts.  The generic

press release blaming the shorts is so old, tired, and predictable. Cmon, you could have at least signed a distribution deal with Santa Claus to bring your products to all the boys and girls of the world.

**Corporate Credibility**
One of the big corporate news story over the past few months was the firing of Mark Hurd from HP for fudging an insignificant amount on an expense report. While this might have been a bit extreme, it shows Wall Street operates with zero tolerance for lying.

What amazes Citron is that the longs in this stock are proud of management's ability to selectively lie. It is OK to lie about the stores… because it is now just a small part of their future revenue projections. Well, it wasn't such a small part of the company's revenues when they used that very track record from those "branded stores" to raise $75 million from US investors.

(we think the only fair thing for the company to do is offer the secondary buyers their money back immediately. )

Meanwhile, is it also OK to lie to the Chinese Government? We are sure there will be a great story as to where the money is now.

Citron believes that the whole business model is a lie from top to bottom and management has zero credibility to say anything different.
Don't forget the old adage: At every poker game there is a sucker, and if you don't know who the sucker is, it is you… You have been warned.

**Cautious Investing To All**
**EXTRA CREDIT READING for the CURIOUS:**
For those of you who still believe in the "stores", I guess we all need some blind faith, here is some fun reading.

**The Results, and the photos**
**43** of the locations published on the company's website, until recently claimed to be "branded outlet" locations have now been surveyed, with photos:

| | |
|---|---|
| Company stores (like those pictured on the company's website) | **2** |
| Supermarkets or drugstores carrying one or two products on a small shelf space : | **16** |
| A store offering no CHBT product whatsoever on its shelves | **17** |
| No retail at that address, or nothing at all | **8** |
| Store-within-store or kiosk (Yes our visitors politely asked) | **0** |

http://www.therealchbt.com/index.php?option=com_stores&view=list&Itemid=8

This is not a rumor.

70.     As further evidence that something is amiss with the Company, on September 21, 2010, Roth Capital, China-Biotics' underwriters on the September 2009 Offering and main investment banker, abruptly downgraded the Company to "Sell" from "Buy" without any intermediate ratings, and put a twelve month target price for the Company's stock at a mere $8.00 per share.

71.     As a result of Defendants' wrongful course of conduct, China-Biotics shareholders have lost millions of dollars in their investment in the Company.

## V.     THE INDIVIDUAL DEFENDANTS' LIES AND OMISSIONS

72.     China-Biotics' statements and filings during the Class Period were materially false and misleading because they failed to disclose and misrepresented: (1) that as of March 31, 2010 there was not actually 111 retail outlets in Shanghai and other Chinese cities, despite what was disclosed to investors in multiple SEC filings during the class period; (2) that as a result of there being virtually no retail outlets or stores, all of the Company's financial statements were materially misleading, and may need to be restated; (3) SEC filings contained incorrect and materially misleading interest figures regarding the  Company's cash holdings, which may need to be restated; (4) that the Company's financial statements and disclosures to the SEC differed significantly from financial figures reported to local Chinese authorities, and as such are materially misleading and may need to be restated; and (5) that the money raised from the September 2009 Offering was not put towards expansion of retail outlets and stores, despite the Company's claims to the investing public in multiple SEC filings and press releases.

73.     In addition to the false and misleading statements described in detail herein, Defendants also failed to disclose the truth regarding China-Biotics' overall financial condition.

Specifically, and in addition to the other omissions described herein, Defendants failed to tell the public the true risks the Company faced with regard to its business operations, and failed to disclose that the Company was operating under false and misleading financial results.

## VI.   UNDISCLOSED ADVERSE INFORMATION

74.   The market for China-Biotics' securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, China-Biotics' securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired China-Biotics' securities relying upon the integrity of the market price of China-Biotics' securities and market information related to China-Biotics, and have been damaged thereby.

75.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of China-Biotics' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

76.   At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about China-Biotics' business, prospects and operations.

77.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of China-Biotics and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII.   <u>SCIENTER ALLEGATIONS</u>

78.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

79.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding China-Biotics, their control over, receipt and/or modification of China-Biotics' allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning China-Biotics, participated in the fraudulent scheme alleged herein.

80.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## VIII.   <u>STATUTORY SAFE HARBOR</u>

81.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

82.    Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer of China-Biotics who knew that such statement was false when made.

## IX.   <u>LOSS CAUSATION</u>

83.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of China-Biotics' securities and operated as a fraud or deceit on Class Period purchasers of China-Biotics' securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of China-Biotics' securities fell as the prior inflation came out of the Company's stock price.  As a result of their purchases of China-Biotics' securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

84.    By failing to disclose the true state of the Company's business prospects and growth strategy, investors were not aware of the true state of the Company's financial status.

Therefore, Defendants presented a misleading picture of China-Biotics' business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused China-Biotics to conceal the truth.

85.     Defendants' false and misleading statements, including statements regarding the September 2009 Offering, had the intended effect and caused China-Biotics' common stock to trade at artificially inflated levels throughout the Class Period.  However, as inflation was taken out of the price due to the effects of Citron's revealing report, China-Biotics' common stock price fell approximately $2.66 per share to $12.03 on August 30, 2010.  This drop caused real economic loss to investors who purchased the Company's securities during the Class Period.

86.     The decline in the price of China-Biotics' common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of China-Biotics' common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of China-Biotics' securities and the subsequent decline in the value of China-Biotics' securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

87.     At all relevant times, the market for China-Biotics stock was an efficient market for the following reasons, among others:

a.      China-Biotics securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.      As a regulated issuer, China-Biotics filed periodic public reports with the SEC and the NASDAQ;

c.      China-Biotics securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.      China-Biotics regularly issued press releases which were carried by national newswires.   Each of these releases was publicly available and entered the public marketplace.

88.     As a result, the market for China-Biotics securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in China-Biotics' stock price.  Under these circumstances, all purchasers of China-Biotics securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## XI.     CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired China-Biotics securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of China-Biotics and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded

person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

90.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, China-Biotics securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "CHBT".  As of June 7, 2010, the Company had approximately 22.37 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by China-Biotics and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

91.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

92.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

93.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.      whether Defendants participated in and pursued the common course of conduct complained of herein;

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of China-Biotics;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of China-Biotics;

e.      whether the market price of China-Biotics common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

94.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

38

## XII.   COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT I
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against Defendants**

95.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendants.

96.     During the Class Period, China-Biotics and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of China-Biotics common stock; and (iii) cause Plaintiff and other members of the Class to purchase China-Biotics stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

97.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for China-Biotics securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of China-Biotics, as alleged herein.

98.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate

truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

99.     China-Biotics and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of China-Biotics as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of China-Biotics' value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about China-Biotics and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of China-Biotics' securities during the Class Period.

100.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual

Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

101.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing China-Biotics' operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.   As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

102.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of China-Biotics

41

securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of China-Biotics shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired China-Biotics securities during the Class Period at artificially inflated high prices and were damaged thereby.

103.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of China-Biotics, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired China-Biotics securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

104.    By virtue of the foregoing, China-Biotics and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

105.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

106.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

107.    The Individual Defendants were and acted as controlling persons of China-Biotics within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

108.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

109.    As set forth above, China-Biotics and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff

and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as this Court deems appropriate.

## XIV.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 13, 2010          **LAW OFFICES OF CURTIS V. TRINKO, LLP**

By: s/ Curtis V. Trinko _____
Curtis V. Trinko (CT-1838)
16 West 46th Street, 7th Floor
New York, NY 10036
Tel:  (212) 490-9550
Fax:  (212) 986-0158
Email:  Ctrinko@trinko.com

*Liaison Counsel for Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Christopher S. Jones (CJ-4131)
Lester R. Hooker
2424 North Federal Highway

44

Suite 257
Boca Raton, FL 33431
Tel:  (561) 394-3399
Fax:  (561) 394-3082

*Lead Counsel for Plaintiff*

**OF COUNSEL:**
Ryan & Maniskas, LLP
Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Tel:  (484) 588-5516
Fax:  (484) 450-2582

*Attorneys for Plaintiff*

## CERTIFICATION

I, John Hill, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.    Plaintiff has reviewed the complaint and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.    Plaintiff's purchase and sale transaction(s) in the **China-Biotics, Inc.** (NASDAQ: CHBT) security that is the subject of this action during the Class Period is/are as follows.

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought | Sold | Date | Price per share |
|---|---|---|---|---|---|
| | SEE ATTACHED | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below _____ N/A _____

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __9th__ day of __OCT__, 2010.

_J. Hill_
Signature

204 PARKMERE COURT A.B.
Address

_____
Email

JOHN R. HILL
Print Name

403235-0566
Phone Number

No
Current or Former Employee (Yes or No)

**SCHEDULE A TO CERTIFICATION OF JOHN R. HILL**
**China-Biotics, Inc.**

**Purchases:**

| Date | Number of Shares | Price/Share |
|------|------------------|-------------|
| March 29, 2010 | 4,000 | $18.40 |
| March 30, 2010 | 1,500 | $18.40 |
| March 31, 2010 | 1,000 | $17.92 |
| May 26, 2010 | 2,000 | $14.90 |
| May 26, 2010 | 2,000 | $14.70 |