## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN HILL, Individually and On Behalf of All Others Similarly Situated, | ) **Civil Action No. 1:10cv07838-PAC** |
| | ) |
| | ) |
| Plaintiff, | ) <u>CLASS ACTION</u> |
| | ) |
| vs. | ) |
| | ) **<u>AMENDED COMPLAINT FOR</u>** |
| CHINA-BIOTICS, INC., JINAN SONG, LI CHI | ) **<u>VIOLATIONS OF THE FEDERAL</u>** |
| YUEN a/k/a RAYMOND LI, LEWIS FAN, YAN | ) **<u>SECURITIES LAWS</u>** |
| YIHONG a/k/a EVA YAN, TRAVIS CAI, CHIN JI | ) |
| WEI, DU WEN MIN, SIMON YICK, ROTH | ) |
| CAPITAL PARTNERS LLC, and MAXIM | ) |
| GROUP LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) <u>JURY TRIAL DEMANDED</u> |

### TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..................................................................... 1

II.    SUMMARY OF THE FRAUD ................................................................. 2

III.   JURISDICTION AND VENUE ............................................................... 6

IV.  THE SECURITIES ACT CLAIMS ......................................................... 6

    A.    PARTIES ..................................................................................... 6

          i.    Plaintiffs ........................................................................ 6

          ii.   Securities Act Defendants .......................................... 7

               1.    The Company ................................................... 7

               2.    The Officer and Director Defendants ............. 7

               3.    The Underwriter Defendants .......................... 8

    B.    ALLEGATIONS UNDER THE SECURITIES ACT ................... 8

V.    COUNTS AGAINST THE SECURITIES ACT DEFENDANTS ............ 13

VI.  THE EXCHANGE ACT CLAIMS ........................................................ 18

    A.    PARTIES ................................................................................... 18

          i.    Lead Plaintiffs ............................................................ 18

          ii.   Defendants .................................................................. 18

               1.    The Company ................................................. 18

               2.    The Individual Defendants ............................. 18

    B.    ALLEGATIONS UNDER THE EXCHANGE ACT ................. 21

          i.    Background of RCMs ................................................ 21

          ii.   Background of China-Biotics ................................... 25

    C.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ... 28

          i.    2008 False and Misleading Statements ................... 28

          ii.   2009 False and Misleading Statements ................... 32

          iii.  2010 False and Misleading Statements ................... 38

    D.    REASONS FOR FALSITY ...................................................... 41

    E.    THE TRUTH COMES TO LIGHT .......................................... 42

          i.    The Citron Research Reports ................................... 42

        **ii.**    **Analysts and News Sources Expose and Downgrade China-Biotics**...46

        **iii.**    **The Confidential Witness Investigation**................................................52

**VII.**    **DEFENDANTS' VIOLATIONS OF ACCOUNTING RULES** ...............................54

**VIII.**    **UNDISCLOSED ADVERSE INFORMATION** ..........................................................60

**IX.**    **SCIENTER ALLEGATIONS** ...............................................................................61

**X.**    **LOSS CAUSATION** ...........................................................................................61

**XI.**    **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**.......................................................................................63

**XII.**    **CLASS ACTION ALLEGATIONS** .........................................................................64

**XIII.**    **COUNTS AGAINST THE EXCHANGE ACT DEFENDANTS** .............................66

**XIV.**    **REQUEST FOR RELIEF** ...................................................................................71

**XV.**    **JURY DEMAND** ...............................................................................................72

By and through their undersigned counsel, Lead Plaintiffs John Hill and Nureddin Nejim ("Lead Plaintiffs") allege the following against China-Biotics, Inc., ("China-Biotics" or the "Company") and certain of the Company's executive officers and directors (the "Individual Defendants"). Lead Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Lead Plaintiffs and, as to all other matters, upon the investigation of counsel.

## I.   NATURE OF THE ACTION

1.    This is a federal securities class action against China-Biotics and certain of its officers for violations of the federal securities laws. Lead Plaintiffs bring this action on behalf of all persons or entities that purchased shares of China-Biotics securities between July 10, 2008 and August 27, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price. As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.    The action is also brought on behalf of all persons or entities who purchased shares of China-Biotics common stock pursuant and/or traceable to the Company's Secondary Public Offering for the sale of 4.6 million shares of China-Biotics common stock at $15.00 per share, closing on or about October 5, 2009 (the "SPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"). Under the Securities Act, Defendants are strictly liable for the material misstatements in the Offering Documents (as defined below) for this secondary public stock offering, and these claims specifically exclude any allegations of knowledge or scienter. The Securities Act Claims also expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

3.      The Complaint alleges that, in China-Biotics' Offering Documents and throughout the Class Period, Defendants materially misrepresented and failed to disclose material adverse facts about the Company's operations, financial well-being and future prospects.  Defendants' actions resulted in the artificial inflation of China-Biotics stock during the Class Period.  As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages, as detailed below.

## II.     SUMMARY OF THE FRAUD

4.      China-Biotics' securities came to be traded on an American stock exchange through a process commonly known as a "reverse merger."  This process is relatively straight forward: a foreign business is typically acquired by a non-operational U.S. shell company that is worthless, except for one thing—the shell company is publicly traded.  Following the merger of the two companies, the board of directors of the U.S. company promptly resigns, and the foreign board takes over, changes the company's name and issues new stock to new investors, thus raising millions of dollars in fresh capital.

5.      Many Chinese companies have exploited the reverse merger process in recent years in order to tap into the lucrative American investor market without being subject to the extensive governmental and regulatory oversight required through a traditional initial public offering.  Since Chinese businesses that use the reverse merger process to lure American investments often keep the bulk, if not all, of their operations in China, there exist significant limitations in the ability of American authorities, such as the SEC, to actively regulate these companies.  While Chinese reverse mergers ("RCMs") have allowed these companies to obtain a comparatively easy influx of capital, the quick-hit and relatively unregulated nature of the

process also allows for fraudulent schemes to game the system and defraud investors of millions of dollars.

6.     This is exactly what happened in the case of China-Biotics.  In fact, China-Biotics is exactly the type of "vessel of outright fraud" described by the SEC as part of an ongoing investigation into RCMs and their catastrophic effects on American investors.

7.     China-Biotics, together with its subsidiaries, engages in the research, development, production, marketing, and distribution of probiotics products, which are basically food supplements in the form of a acidophilus pill that are marketed as improving intestinal microbial balance.  In the Company's publicly disseminated documents during the Class Period, including in the Offering Documents, China-Biotics represented to investors that it had a robust and growing network of retail outlets in China that would purportedly include up to 300 retail centers by 2011.  Moreover, in these same filings and public statements, the Company announced impressive financial results and figures, including over $64 million in cash, $42 million in revenue, $30 million in gross profits, $17.5 million in net income and $13 million in accounts receivable for 2008.  These exciting reports of a budding operational and financial powerhouse created strong demand for China-Biotics securities, thus increasing substantially the Company's stock price and allowing Defendants to complete a secondary public offering of common stock in October 2009, from which it reaped proceeds of over $65 million.

8.     The good will for China-Biotics, however, was short-lived.  Investigators started chipping away at the Company's façade in 2010, when reports began surfacing that China-Biotics had fabricated the number of stores and retail outlets the Company operated.  In some cases, private investigators hired to take pictures of purported China-Biotics retail outlets failed to find any evidence that certain locations even existed, some locations were parking lots or

residential buildings, and other locations were supermarkets or drugstores that had only one or two China-Biotics for sale on their shelves.  In fact, separate investigations of the Company found that China-Biotics only had six or seven retail outlets—a far cry from Defendants' statements concerning 100+ outlets during the Class Period.

9.      Tellingly, shortly after these allegations came to light, the Company actually *changed its website* and removed statements concerning its retail outlets, its expansion plans and its most recognizable customers – essentially conceding the falsity of their earlier statements. Now, Defendants' emphasis on the Company's robust expansion plans and its large-scale clientele are nowhere to be found on China-Biotics' website.

10.      The news for China-Biotics went from bad to worse when a comparison of the Company's SEC filings and its filings with the Chinese equivalent of the SEC came to light.  The discrepancies between these numbers are disturbing and cannot be explained away by mere differences in accounting standards or currency valuations between the two countries.  In fact, it is now apparent that China-Biotics essentially maintained two sets of financial records—a seemingly accurate version for Chinese authorities (where deception can be punishable by death), and a second set of overstated figures used to deceive the American investing public into believing that the Company was poised for significant financial growth.

11.      For instance, with regard to China-Biotics' 2008 financial filings, a comparison of the Company's financial disclosures with the SEC and with the Chinese regulators at the State Administration for Industry and Commerce ("SAIC") demonstrates radical inconsistencies:

| **2008 Filings Disclosures** | **SAIC** | **SEC** |
|---|---|---|
| **Cash** | $100,000 | $64,300,000 |
| **Accounts Receivable** | $1,000,000 | $13,200,000 |
| **Revenues** | $500,000 | $42,300,000 |
| **Gross Profits** | $200,000 | $30,000,000 |

| **Net income** | ($1,200,000) | $17,500,000 |

12.    As more and more information came to light regarding the true state of China-Biotics' business and operations—including the sudden resignation of the Company's CFO and the fact that the Company's retail outlet network was a fraction of what was publicly disclosed—a picture emerged of an international fraud that had capitalized on the lax entry requirements of RCMs to rope in and defraud American investors of millions of dollars.  Defendants' lies and omissions are startling as they, among other things: (i) fabricated the size and scale of China-Biotics operations, including the number of retail outlets both in existence and planned through expansions, the quality and membership of its clientele, and the Company's employee force; (ii) exaggerated financial results in order to give the appearance of a growing and stable enterprise, thus attracting more interest in the SPO; (iii) bolstered financial figures through embellished lease expenses, cash amounts, and tax information that did not match with information reported to Chinese authorities or to a company that operated six or seven actual retail stores; (iv) failed to disclose that the Company suffered from inadequate auditing and financial reporting; (v) failed to disclose that the Company's financial results were not prepared in accordance with Generally Accepted Accounting Principles; and (vi) failed to disclose that the Company's U.S. filings were inconsistent with, and in many cases contradictory to, its filings with Chinese authorities.

13.    As a result of Defendants' fraud, and in a stunning fall from China-Biotics' Class Period high of $19.74, the Company's stock price plummeted all the way to $12.03 when the truth of Defendants' scheme was fully revealed, a decline of nearly 40% that caused millions of dollars in damages to Lead Plaintiffs and the Class.

III.     **JURISDICTION AND VENUE**

14.     This action arises under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k and 77o), and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307, Section 22 of the Securities Act (15 U.S.C. § 77v), and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act.  China-Biotics trades on the NASDAQ under the symbol "CHBT."

17.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

IV.     **THE SECURITIES ACT CLAIMS**

     A.     **PARTIES**

          i.     **Plaintiffs**

18.     Plaintiff John Hill acquired shares of China-Biotics pursuant or traceable to the Company's Secondary Public Offering (the "SPO") at artificially inflated prices during the Class Period and has been damaged thereby.

19.     Plaintiff Nureddin Nejim acquired shares of China-Biotics pursuant or traceable to the Company's Secondary Public Offering (the "SPO") at artificially inflated prices during the Class Period and has been damaged thereby.

ii.     **Securities Act Defendants**

1.     **The Company**

20.     Defendant China-Biotics is a corporation incorporated under the laws of Delaware with principal executive offices located at No. 999, Ningqiao Road, Jinqiao Export Processing Zone, Pudong, Shanghai, Peoples' Republic of China, 201206.

2.     **The Officer and Director Defendants**

21.     Defendant Jinan Song ("Song") has served as the Company's Chief Executive Officer, President, Chairman of the Board of Directors, Treasurer, and Secretary since March 2006.   Song is also Chairman of the Company's Nominating Committee of the Board of Directors.

22.     Defendant Lewis Fan ("Fan") served as the Company's Chief Financial Officer from March 2009 until his sudden resignation effective October 21, 2009.

23.     Defendant Chin Ji Wei ("Wei") has served as a director of the Company since January 2007.   Wei is a member of the Company's Audit, Nominating, and Compensation Committees.

24.     Defendant Du Wen Min ("Min") has served as a director of the Company since January 2007.   Min is Chairman of the Compensation Committee, and a member of the Audit and Nominating Committees.

25.     Defendant Simon Yick ("Yick") has served as a director of the Company since January 2007.   Yick serves as Chairman of the Audit Committee, and is a member of the Compensation Committee.

26.     Defendants Song, Fan, Wei, Min, and Yick are collectively referred to herein as the "Officer and Director Defendants."   The Officer and Director Defendants served as officers

and/or directors of China-Biotics during the Class Period, and are strictly liable under the Securities Act for endorsing the Company's false statements in the Offering Documents.

### 3.    The Underwriter Defendants

27.    Defendant Roth Capital Partners LLC ("Roth Capital") acted as an underwriter for the Company's SPO.

28.    Defendant Maxim Group LLC ("Maxim Group") acted as an underwriter for the Company's SPO.

29.    Defendants Roth Capital and Maxim Group are collectively referred to herein as the "Underwriter Defendants."

30.    Defendants China-Biotics, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

### B.    ALLEGATIONS UNDER THE SECURITIES ACT

31.    On June 30, 2009, China-Biotics filed a Form 424(b)(3) prospectus (the "Prospectus") with the SEC in connection with the SPO for the sale of the Company's shares at $15.00 per share.  In addition, the Company also filed the following documents with the SEC: (i) a Form S-1 Registration Statement on March 5, 2009 (the "Registration Statement"); (ii) a Form S-1/A Pre Effective Amendment No. 1 on June 11, 2009 ("Registration Statement Amendment No. 1"); (iii) a Form 424(b)(3) prospectus on June 30, 2009 (the "Prospectus"); (iv) a Form S-3 on July 10, 2009 (the "Form S-3"), (v) a Form S-3/A Amendment No. 1 to the Form S-3 on August 24, 2009 (the "Form S-3 Amendment No. 1"); (vi) a Form S-3/A Amendment No. 2 to the Form S-3 on September 4, 2009 (the "Form S-3 Amendment No. 2"); (vii) a Form 424(b)(5) Prospectus Supplement on September 29, 2009 (the "Initial Prospectus Supplement"); and (viii) a Form 424(b)(5) prospectus on  September 30, 2009 (the "Second Prospectus Supplement").

The Prospectus, Registration Statement, Registration Statement Amendment No. 1, Form S-3, Form S-3 Amendment No. 1, Form S-3 Amendment No. 2, Initial Prospectus Supplement, and Second Prospectus Statement are all collectively referred to herein as the "Offering Documents."

32.     The SPO allowed China-Biotics to sell 4.6 million shares of common stock at $15.00 per share, providing aggregate net proceeds to the Company of approximately $65.5 million, after deduction of underwriting discounts and commissions but excluding offering expenses.

33.     According to the Offering Documents, Roth Capital acted as the manager and the representative of the Underwriter Defendants.  The Company granted the Underwriter Defendants 30 days to purchase up to an additional 690,000 shares to cover over-allotments, if any.

34.     The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing its preparation.

35.     With respect to the effects that the SPO would have on the Company, including China-Biotics' plans for the capital raised through the SPO, the Offering Documents stated the following:

- **Use of Proceeds**: We will receive net proceeds from this offering of approximately $65,100,000, after deducting underwriting discounts and commissions and estimated offering expenses paid and payable by us. We intend to use the net proceeds from the sale of the securities in this offering for general corporate purposes, including expanding our retail operations, expanding our products, acquiring additional retail outlets and product lines and for general working capital purposes.

- We intend to expand our operations by opening additional new retail outlets to facilitate direct sales of our products to customers.

- We are also in the process of developing new products to strengthen our product pipeline so that we may offer an array of products for sale in Shining outlets.

- We expect that the additional demands from opening new outlets will be met initially by increasing production from our existing plant, which currently has the necessary capacity, and in the longer term from our new plant that will have a capacity of 150-300 tons.

- **Selling expenses:**  Selling expenses were $3,330,668 or 21.1% of net sales for the three months ended December 31, 2008 compared with $1,752,637 or 14.7% of net sales for the three months ended December 31, 2007. The operating costs of the retail outlets are included as selling expenses. The increase in selling expenses was primarily caused by the roll out of retail outlets.

- As of December 31, 2008, we had a total of 107 retail outlets in operation compared with 27 outlets as of December 31, 2007.

- We are expanding our sales to other cities in China through a combination of distributors and our own outlets.

- In this regard, we have opened 107 outlets in Shanghai and 12 other cities in China at December 31, 2008 and intend to have over 300 outlets by the end of fiscal year 2010 at an anticipated cost of approximately $7.72 million.

- In preparation for the opening of our retail outlets, we have repackaged a number of our existing products for sale in our outlets, and have introduced several new products which are available exclusively in our outlets. The costs of repackaging the existing products and releasing the new products are minimal and have been included in our cost of sales and selling and administrative expenses.

- We intend to expand the sale of our products to the other metropolitan cities in China through a combination of the traditional distribution channels and dedicated Shining outlets.

- We opened our first store in Shanghai in March 2006, and plan to open additional Shining outlets in Beijing, Shanghai, Jiangsu, Zhejiang, Shenyang, Harbin and Heilongjiang.

- Over the past five years, we believe we have firmly established ourselves in Shanghai as the leading supplier and manufacturer of probiotics products. We now intend to expand the sale of our products to the other metropolitan cities in China through a combination of the traditional distribution channels and dedicated Shining outlets.

- In preparation for the opening of additional retail outlets, we have also been actively recruiting and training retail sales staff since the beginning of 2006. We have already successfully recruited a number of very experienced sales professionals and have trained a pool of sales staff.

- [W]e have surveyed the other cities in China to assess and select suitable locations for new outlets.

- As part of our strategy, we will also consider licensing franchisees to operate retail outlets in due course.

- We expect that each Shining outlet will employ a combination of employees and agents. The agents will be remunerated mainly on a commission basis, which will minimize our fixed overhead costs.

- **Employees:** As at December 31, 2008, we had 360 staff and employees.   The following table summarizes the functional distribution of our employees:

| Department | Headcount |
|---|---|
| Management and Administrative | 9 |
| Sales and Marketing | 25 |
| **Retail Outlet** | **175** |
| Research and Development | 30 |
| Production | 83 |
| Finance and Accounting | 6 |
| New Plant | 32 |
| Total | 360 |

- The Group leases office space, warehouse facilities and retail outlets that expire at various dates through 2008 to 2010. As of the balance sheet dates as presented in these financial statements, the amount of future minimum lease payment under the above-mentioned operating leases were as follows:

| | December 31, 2008 | March 31, 2008 |
|---|---|---|
| Payable within | | |
| the next twelve months | $479,454 | $556,907 |
| the next 13th to 24th months | | $111,670 |
| the next 25th to 36th months | | |
| the next 37th to 48th months | | |
| the next 49th to 60th months | | |
| Thereafter | | |
| | $479,454 | $668,577 |

36.    With respect to the Company's reported financial figures, the Offering

Documents stated the following select financial information:

11

**CONSOLIDATED STATEMENT OF INCOME DATA:**

| | Three months ended June 30, 2009 | | | Year ended March 31, 2009 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2009 | | 2008 | | 2009 | | 2008 | | 2007 | 2006 |
| | (unaudited) | | | | (in thousands, except for share and per share data) | | | | |
| **Statement of Operations Data** | | | | | | | | | |
| Net Sales $ | 15,412 | $ | 11,371 | $ | 34,197 | $ | 42,321 | $ | 36,610 | $ | 21,862 |
| Cost of goods sold | 4,499 | | 3,259 | | 16,197 | | 12,310 | | 8,911 | | 6,445 |
| Gross profit | 10,913 | | 8,112 | | 38,966 | | 36,911 | | 21,699 | | 15,417 |
| Income from operations | 6,368 | | 5,763 | | 21,743 | | 18,315 | | 14,991 | | 12,185 |
| Net income | 5,768 | | 3,267 | | 19,967 | | 17,542 | | 10,995 | | 8,354 |
| **Earnings per share** | | | | | | | | | |
| Basic and diluted $ | 0.34 | $ | 0.19 | $ | 1.17 | $ | 1.03 | $ | 0.64 | $ | 4.90 |
| Shares used in per share calculation Basic | 17,680,666 | | 17,680,666 | | 17,680,666 | | 17,680,666 | | 17,680,666 | | 1,705,242 |

37. The statements and representations discussed above were materially false and misleading and failed to disclose material information concerning China-Biotics' business and operations, including, among other things, the following:

(i) China-Biotics had substantially inflated the number of retail outlets it operated in its business, and thus the Company had never established itself as a leading supplier and manufacturer of probiotics products in China;

(ii) The Company had substantially exaggerated its expansion plans and thus had no sustainable plans to reach a maximum number of 300 retail stores by the end of fiscal year 2010 because China-Biotics had inflated the number of retail outlets in its operation;

(iii) Because of the Company's exaggerated expansion plans, China-Biotics' statements concerning active recruiting and training of retail sales staff, along with the number of retail employees under its corporate umbrella, were inaccurate and misleading;

(iv) China-Biotics' purported plans to use the proceeds from the SPO to fund expansion, facilitation of direct sales products to customers, strengthening of product pipelines, and expansion of sales through dedicated Shining outlets, were exaggerated and, in some cases, completely fabricated;

(v) The Company's reported financial figures in the Offering Documents were not calculated in accordance with GAAP, did not match up with the comparable

12

financial results the Company reported to the Chinese SAIC and, as a result, were wholly inaccurate and misleading;

(vi)     China-Biotics failed to disclose that it was operating under inadequate auditing and financial reporting standards; and

(vii)    As a result of the above, the Company's statements concerning its business, operations and future growth were materially false.

38.     Accordingly, Defendants capitalized on an artificial demand for China-Biotics' securities that was bred from their concerted effort to create an illusion of financial and operational strength, stability and growth for the Company.  By making false and materially misleading statements in the Offering Documents, the Securities Act Defendants are strictly liable pursuant to the Securities Act.

## V.     COUNTS AGAINST THE SECURITIES ACT DEFENDANTS

### COUNT I
### Violation of Section 11 of The Securities Act
### Against The Securities Act Defendants

39.     Lead Plaintiffs incorporate the allegations set forth above pertaining to the false Offering Documents, as if set forth fully herein, only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class.  This Count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Offering Documents under the Securities Act.

40.     This claim is asserted by Lead Plaintiffs against the Securities Act Defendants by, and on behalf of, persons who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the SPO.  The Offering Documents for the SPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts, as described above.

13

41.     The Securities Act Defendants are strictly liable for the misstatements and omissions and for the damages that Lead Plaintiffs and other members of the Class have sustained thereby.  The Securities Act Defendants are responsible for the contents and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

42.     The Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct alleged herein, each Section 11 Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

<u>COUNT II</u>
**Violation of Section 12(a)(2) of The Securities Act**
**Against China-Biotics and the Underwriter Defendants**

43.     Lead Plaintiffs incorporate the allegations set forth above pertaining to the false Offering Documents, as if set forth fully herein, only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Lead Plaintiffs or members of the Class.  This Count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Offering Documents under the Securities Act.

44.     This Count is brought against China-Biotics and the Underwriter Defendants on behalf of all persons or entities who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the SPO.  China-Biotics and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Documents.

14

45.     The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  China-Biotics' and the Underwriter Defendants' actions of solicitation included participating in the preparation and dissemination of the false and misleading Offering Documents.

46.     China-Biotics and the Underwriter Defendants owed to the purchasers of the Company's common stock, including Lead Plaintiffs and the members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  China-Biotics and the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

47.     Lead Plaintiffs and the other members of the Class purchased or otherwise acquired China-Biotics' securities pursuant to and/or traceable to the defective Offering Documents.  Lead Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

48.     By reason of the conduct alleged herein, these Defendants violated and/or controlled a person who violated §12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiffs and members of the Class who hold China-Biotics securities purchased directly in or traceable to the SPO have the right to rescind and recover the consideration paid for such China-Biotics securities, and hereby elect to rescind and tender their China-Biotics securities to the Securities

Act Defendants sued herein.  Lead Plaintiffs and Class members who have sold their China-Biotics securities are entitled to rescissory damages.

49.     This action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based.

**COUNT III**
**Violation of Section 15 of the Securities Act**
**Against the Officer and Director Defendants**

50.     Lead Plaintiffs incorporate the allegations set forth above pertaining to the false Offering Documents, as if set forth fully herein, only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud Lead Plaintiffs or members of the Class.  This Count is predicated upon the Securities Act Defendants' strict liability for making false and materially misleading statements in the Offering Materials under the Securities Act.

51.     This Count is brought against the Offer and Director Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons or entities who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the SPO.  Each of the Officer and Director Defendants was a controlling person of China-Biotics by virtue of their positions as directors and/or senior officers of the Company and/or by virtue of their status as a major shareholder of the Company.

52.     Each of the Officer and Director Defendants was a control person of the Company with respect to the SPO by virtue of that individual's position as a senior executive officer and/or director of the Company.  These Defendants each had a series of direct and/or indirect business

and/or personal relationships with other directors and/or officers and/or major shareholders of China-Biotics.  By reason of their positions with the Company and/or their stock ownership of China-Biotics, the Officer and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged in Count I.

53.    Each of the Officer and Director Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Offering Documents and having otherwise participated in the process that allowed the SPO to be successfully completed.  These Defendants, by virtue of their managerial and/or Board positions with the Company, controlled the Company as well as the contents of the Offering Documents at the time of the SPO.  Each of the Officer and Director Defendants was provided with or had unlimited access to copies of the Offering Documents and had the ability to either prevent their issuance or cause them to be corrected.

54.    As a result, the Officer and Director Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

55.    By virtue of the foregoing, Lead Plaintiffs and other members of the Class who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the SPO are entitled to damages against the Officer and Director Defendants.

**VI.**     **THE EXCHANGE ACT CLAIMS**

    **A.**     **PARTIES**

        **i.**     **Lead Plaintiffs**

56.     Lead Plaintiffs John Hill and Nureddin Nejim purchased or otherwise acquired the publicly traded securities of China-Biotics during the Class Period at artificially inflated prices and have been damaged thereby.

        **ii.**     **Defendants**

            **1.**     **The Company**

57.     Defendant China-Biotics is a corporation incorporated under the laws of Delaware with headquarters in in the People's Republic of China ("PRC").  During the Class Period China-Biotics maintained executive offices at No. 999 Ningqiao Road, Jinqiao Export Processing Zone, Pudong, Shanghai, 201206, PRC.

            **2.**     **The Individual Defendants**

58.     Defendant Jinan Song ("Song") has served as the Company's Chief Executive Officer, President, Chairman of the Board of Directors, Treasurer, and Secretary since March 2006.

59.     Defendant Li Chi Yuen a/k/a Raymond Li ("Li") served as the Company's Chief Financial Officer from the beginning of the Class Period until March 6, 2009 when he was replaced by Defendant Lewis Fan.  Thereafter, Li continued to work at the Company as the Vice President of Finance.

60.     Defendant Lewis Fan ("Fan") served as the Company's Chief Financial Officer from March 2009 until his sudden resignation on October 21, 2009.

61.     Defendant Yan Yihong a/k/a Evan Yan ("Yan") served as the Company's Chief Financial Officer from October 2009 until her resignation on January 22, 2010.  Yan is the sister-in-law of Mr. Song.

62.     Defendant Travis Cai ("Cai") served as the Company's Chief Financial Officer from January 2010 through the end of the Class Period.

63.     Defendants Song, Li, Fan, Yan, and Cai collectively referred to herein as the "Individual Defendants."

64.     The Individual Defendants and China-Biotics are collectively referred to herein as the "Exchange Act Defendants."

65.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding China-Biotics, their control over, receipt and/or modification of China-Biotics' allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning China-Biotics, participated in the fraudulent scheme alleged herein.  The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

66.     During the Class Period, the Individual Defendants, as senior executive officers of China-Biotics, were privy to confidential, proprietary and material adverse non-public information concerning China-Biotics, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information

provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

67.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of China-Biotics' business.

68.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through such analysts, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

69.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to China-Biotics' financial condition and performance, growth, operations, financial

statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of China-Biotics' securities would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

70.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of China-Biotics' publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

### B.     ALLEGATIONS UNDER THE EXCHANGE ACT

#### i.     Background of RCMs

71.     China-Biotics' entry onto the NASDAQ is just another example of a recent trend where operating Chinese companies effectuate reverse mergers with all-but-defunct publicly-traded U.S. corporations in order to trade on U.S. stock exchanges.  Once the reverse merger is completed, the tried-and-true process that is typically followed is simple: the board of directors of the U.S. company resigns and the Chinese board takes over, immediately changing the company's name and issuing new stock to new investors, usually through a private placement, thus quickly raising millions of dollars in fresh capital.

72.     Although an RCM allows a Chinese company to trade on a U.S. stock exchange and tap into the lucrative American investment market, these companies' assets and operations are often solely located in China.  This limits the SEC's ability to regulate and enforce the securities laws against Chinese companies, especially given that these corporations did not complete the more rigorous requirements of an initial public offering.

73.     Shielded by the geographic distance of thousands of miles and operating under a regulatory framework that is a world apart from the SEC's oversight, RCM companies have few incentives to provide complete and accurate disclosures to American investors and every incentive to maximize investments and profits.  An August 28, 2010 article in *Barron's* by Bill Alpert and Leslie P. Norton entitled, "Beware This Chinese Export," discusses the enforcement problems that American regulators face when dealing with Chinese companies that trade on U.S. exchanges through RCMs.  The article states that "***[t]he SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S.***"

74.     Since 2004, there have been more than 350 small Chinese companies listed in the U.S. as a result of the reverse merger process.  These companies attempt to establish the strength of their businesses with financial statements that can attract the interest of American investors, both casual and professional alike, while giving the appearance of stability and growth. However, these financial reports often lack transparency and full disclosure, and even more troubling, are often falsified.

75.     These companies' SEC filings often stand in stark contrast to comparable filings with the Chinese equivalent of the SEC, the SAIC— the Chinese government agency responsible for drafting and implementing legislation concerning the administration of industry and commerce in China.  SAIC regulations are implemented by local AIC branches.  All Chinese companies file a variety of information with their local AIC office, including, among other things, property leases, land use information, business licenses, capital raises, bylaws and, importantly, annual financial statements.  While some sectors of the investing public question the significance of SAIC filings, many leading analysts indicate that accuracy in SAIC filings is "an

22

imperative."[1]   In fact, Peter Humphrey, a forensic accountant and corporate due diligence investigator in China, puts it bluntly: "The apologists for the fraudsters in the U.S. like to downplay the importance of SAIC filings *because doing so serves their purposes*."[2]

76.     Recently, many RCMs have been identified as fraudulent schemes where financial results and operational figures have been greatly exaggerated—and in some cases fabricated—in order to attract overseas investments.  Often, examinations of filings with the SAIC, have demonstrated sobering inconsistencies when viewed against the comparable figures filed in the U.S.  Invariably, the American filings feature robust financial results and exciting statements of growth and expansion, while the Chinese filings are comparatively conservative, if not polar opposites.  In essence, one version is prepared to lure foreign investment without the threat of repercussions from American regulators, while the true version is reported at home.

77.     RCMs were effective in attracting interest in small Chinese companies that were purportedly poised for growth and achievement.  According to a *CNBC.com* article published on December 21, 2010 and entitled "Greenberg: Dangers Lurk in Chinese Reverse Mergers," there are around 300 reverse mergers trading in the U.S.  American investors have suffered losses in excess of $30 billion as a result of their investments in RCMs.

78.     As reports of fraud and manipulation have inundated the international business news in recent quarters, U.S. regulators have finally begun to take notice of the opportunities for manipulation and fraud that RCMs create.  The SEC has recently established a task force to investigate investors' claims regarding the impropriety and fraud of RCMs trading on the U.S. markets.  Investigators are examining individual companies as well as the role of so-called

---

[1] Gerry Wang, Chief Executive Officer of a containership company in Vancouver, Canada.

[2] February 10, 2011 *SeekingAlpha.com* article entitled, "China-Biotics: Record Earnings Don't Negate Five Unresolved Issues." http://seekingalpha.com/article/251960-china-biotics-record-earnings-don-t-negate-five-unresolved-issues.

"gatekeepers," or firms that help find and bring Chinese businesses to U.S. capital markets, such as stock promoters, auditors, law firms, and investment banks.

79.     The SEC has also started investigating reverse mergers and the allegations of fraud surrounding Chinese companies like China-Biotics.  For instance, in his speech to the Council of Institutional Investors on April 4, 2011, SEC Commissioner Luis A. Aguilar (the "Commissioner") discussed Chinese reverse mergers and the process of "backdoor registration," stating:[3]

> A common but lesser known way of accessing the public markets is the reverse merger into a public shell, or where a public shell merges into a private company, a so-called "backdoor registration." For those of you not familiar with these types of mergers, what typically happens is a private company seeking to go public merges with a public shell company. Before the transaction, the public shell company no longer has substantive operations, but its public company registration remains in effect. The transaction gives the formerly private company the credibility and access to capital of being registered as a public company, without any of the vetting from underwriters and investors that companies undergo when they perform a traditional IPO.
>
> Since January of 2007, there have been over 600 backdoor registrations. Over 150 of these have been by companies from China and the China region. Notwithstanding the SEC rulemaking of a few years ago to respond to abuses involving shell companies, *we are seeing increasing problems.* While the vast majority of these Chinese companies may be legitimate businesses, *a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud.* (Emphasis added) (footnotes omitted).[4]

80.     Further, in discussing regulators' responses to the problems posed by these Chinese reverse merger companies, the SEC Commissioner stated:

> I support all of the efforts to address these problems. The SEC staff has been working collaboratively and tirelessly with many others to investigate and shed light on this situation. It has been widely reported that the SEC set up an internal task force to investigate fraud in overseas companies with listings on U.S. exchanges, with particular emphasis on companies engaging in these mergers to

---

[3] Text of the entire speech is available at
http://sec.gov/news/speech/2011/spch040411laa.htm#P79_43025.

[4] Unless otherwise indicated, emphasis is added.

achieve backdoor SEC registration. The staff's hard work has yielded, and will continue to yield, results.

81.     The SEC Commissioner also discussed his concerns that RCMs suffer from auditing and financial reporting deficiencies, stating:

> In the world of backdoor registrations to gain entry into the U.S. public market, the use by Chinese companies has raised some unique issues, even compared to mergers by U.S. companies. Two important ones are:
>
> - First, there appear to be *systematic concerns with the quality of the auditing and financial reporting*; and
>
> - Second, even though these companies are registered here in the U.S., there are *limitations on the ability to enforce the securities laws, and for investors to recover their losses when disclosures are found to be untrue, or even fraudulent*.
>
> *I am worried by the systematic concerns surrounding the quality of the financial reporting by these companies.* In particular, according to a recent report by the staff of the Public Company Accounting Oversight Board (PCAOB), *U.S. auditing firms may be issuing audit opinions on the financials, but not engaging in any of their own work*. Instead, the U.S. firm may be issuing an opinion based almost entirely on work performed by Chinese audit firms. If this is true, it *could appear that the U.S. audit firms are simply selling their name and PCAOB-registered status because they are not engaging in independent activity to confirm that the work they are relying on is of high quality.* This is significant for a lot of reasons, including that the PCAOB has been prevented from inspecting audit firms in China.

82.     The SEC Commissioner's concerns articulated in his April 2011 speech were spawned from the repeated shareholder abuses inflicted by dubious RCMs such as China-Biotics.

### ii.     Background of China-Biotics

83.     China-Biotics is engaged in the research, development, production, marketing and distribution of probiotics products in China—in essence, food supplements in the form of acidophilus pills. Most probiotics are bacteria-based and naturally exist in the human body in the lower intestinal tract. The introduction of "helpful" bacteria and other organisms can aid in preventing infections and improve digestion.

84.     The Company's first product, Shining Essence, was launched in Shanghai in April

2001, after being approved by the Chinese Ministry of Health for production and marketing as a

health product in August 2000.  China-Biotics claims that Shining Essence is its bestselling

product, representing approximately 29% of sales for the year ended March 31, 2010, 40% for

the year ended March 31, 2009, and 48% for the year ended March 31, 2008.  The Company also

claims that Shining Essence was named the bestselling liver health product by The Health Food

Association of China in 2001.

85.     The Company says it has obtained the following certifications for its production

processes for Shining Essence, including: (i) ISO 9001:2008 certification from TÜV

Anlagentechnik GmbH, which expires in 2015; (ii) ISO 14001:2004 certification from TÜV

Anlagentechnik GmbH, which expires in 2013; (iii) OHSAS 18001 certification from TÜV

Hong Kong Ltd, which expires in 2012; and (iv) Hazard Analysis Critical Control Point

(HACCP) DS 3027 E: 1997 certification from TÜV Anlagentechnik GmbH, which expires in

2012.  The Company also says it has obtained the Good Manufacturing Process (GMP)

certification from the Shanghai Food and Drug Administration for its new production facility in

Qingpu Industrial Park, which expires on March 28, 2013.

86.     China-Biotics also says that it manufactures several health supplements under the

"Shining" brand in China, including the following four main retail products: (i) Shining Essence,

consisting of lactobacillus acidophilus and bifidobacterium, which aims to balance the

microecology of the digestive system and strengthen liver function; (ii) Shining Signal,

consisting of monascus rice and lactobacillus acidophilus, which focuses on reducing high blood

pressure, blood sugar, and hyperlipidemia; (iii) Shining Golden Shield, which consists of

bifidobaceriumadolescentis and lentinusedodes, and focuses on enhancing the body's immune

system; and (iv) Shining Energy, which consists of Vitamin C, L. Arginine and amino acids, and focuses on promoting the development of brain cells, and enhancing alertness and energy.

87. According to China-Biotics' Form 10K filed on June 14, 2010 for the period ending March 31, 2010, the Company currently has three patents for production process, packaging design, and packaging equipment design, as well as a patent for the production of a blood cholesterol reduction product.

88. Before becoming China-Biotics, the Company was initially incorporated in Delaware in February 2003, under the name Otish Resources, Inc. ("Otish Resources"). Until March 2006, Otish Resources was a mineral exploration stage company based out of Vancouver, British Columbia, Canada, which specialized in acquiring and consolidating mineral properties with potential for commercial ore bodies, such as diamonds.

89. On March 22, 2006, Otish Resources was purchased by Sinosmart Group, Inc. ("SGI"). Immediately thereafter, SGI transferred all of its equity securities to Otish Resources in exchange for 15,980,000 shares of Otish Resources common stock (the "Reverse Merger Share Exchange"). After the Reverse Merger Share Exchange, SGI became a wholly-owned subsidiary of Otish Resources. In connection with the Reverse Merger Share Exchange, the Company filed an amended and restated certificate of incorporation with the Secretary of State of Delaware, changing its name to "China-Biotics, Inc."

90. Following the completion of the Reverse Merger Share Exchange and the amendments to the certificate of incorporation, China-Biotics securities began trading on the NASDAQ under the symbol "CHBT," thus enabling Defendants to carry out a fraudulent scheme and course of conduct that siphoned millions of dollars from overseas investors and into the safely guarded pockets of the Company's insiders in China.

27

C.   **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

91.   Throughout the Class Period, Defendants issued various press releases, SEC filings, financial reports and other statements that consistently touted China-Biotics as an emerging superstar in the world of Chinese probiotics.  To hear Defendants tell it, the Company was poised to capitalize on its strong business fundamentals and embark on a prolonged expansion period where it would substantially escalate its retail outlets and sales force, thus increasing what were already impressive financial results.  Unfortunately for the Company's shareholders, however, the case for China-Biotics was but a house of cards that would come crashing down when the truth concerning the Company's actual business state came to light.

i.   **2008 False and Misleading Statements**

92.   The Class Period commences on July 10, 2008.  On that day, the Company filed a Form 10-KSB with the SEC for the fiscal year ending March 31, 2008, which was signed by Defendants Song and Li.  In this filing, the Company touted the increasing number of retail outlets China-Biotics opened in Shangai, as well as aggressive plans for expansion over the next year:

> From March 2006, when we opened our first store in Shanghai, **we have a total of 60 stores as of March 31, 2008**.  About three quarters of these stores are located in Shanghai and the rest are located in 5 other cities in China. **We plan to have over 300 stores by March 31, 2009**.

93.   Also on July 10, 2008, the Company issued a press release discussing its financial results for the fourth quarter and fiscal year ended March 31, 2008.  The press release emphasized China-Biotics' purportedly increasing financial results, including fourth quarter increases in net sales of 51.5% and in gross profit of 40.7%.  For fiscal 2008, net sales were up 38.3%, which was attributed to increased sales volume and increases in average selling prices.  Commenting on these financial results, Defendant Song stated the following:

We concluded the 2008 fiscal year with a strong finish, continuing to achieve high growth in revenues and net income, as our combined strategy of company-owned retail stores and traditional sales through distributors was a great success…We look forward to another promising fiscal year in 2009, as we remain on schedule to complete construction and begin production at our new bulk additives facility in the latter part of the 2008 calendar year. *By then, we expect to become the dominant supplier of naturally occurring probiotic bacteria in China*.

*With the expansion of our retail sales and bulk additives businesses, we continue to expect significant new business opportunities during the 2009 fiscal year*. Same-store sales for Shining retail stores that have been in operation at least one year are expected to grow significantly year-over-year, and *we hope to increase the number of Shining retail outlets to 300 by the end of March 2009*.

94.    On July 11, 2008, the next trading day following these positive announcements, the Company's stock increased $1.35 per share to close at $11.90.

95.    On August 14, 2008, the Company filed a Form 10-Q with the SEC for the period ending June 30, 2008, which was signed by Defendant Li.  The Form 10-Q stated in pertinent part as follows:

We intend to expand our sales to other cities in China through a combination of distributors and our outlets (training and logistics centers).  In this regard, we *intend to open over 300 outlets by the end of fiscal year 2009. As at June 30, 2008, we have opened 83 outlets in Shanghai and 8 other cities in China* (as of June 30, 2007, we had 14 retail outlets).

96.    Also on August 14, 2008, China-Biotics issued a press release discussing the Company's first quarter 2009 financial results.  The press release provided in pertinent part as follows:

Operating expenses increased to $3.8 million from $2.1 million in the first quarter of fiscal 2008. The increase was attributed to setup and operations costs for new retail outlets; increased salary expense stemming from new hires to support the Company's expansion; and additional research costs associated with the development and launch of new products. *As of June 30, 2008, the Company had 339 employees and operated 83 Shining-branded retail outlets, up from 208 employees and 14 Shining outlets on June 30, 2007*.

29

97.     In discussing the Company's first quarter 2009 financial results and its overall

business outlook, Defendant Song emphasized again China-Biotics' expansion plans and the

strength of its operational portfolio of retail stores:

> As our retail and bulk additives businesses continue to expand, we are managing
> our capacity utilization carefully to strike a balance between achieving current
> and future sales growth.  We are pleased that we were able to begin achieving
> meaningful sales of our bulk additives to commercial customers. ***We are also
> working on rolling out new retail outlets as quickly as we can. Those outlets
> already open more than one year have demonstrated tremendous year-over-year
> sales growth, and we believe that, in time, the retail strategy will contribute
> significantly to our growth***.

98.     On November 10, 2008, the Company filed a Form 10-Q with the SEC for the

period ending September 30, 2008, which was signed by Defendant Li.  The Form 10-Q

provided the following regarding the Company's operational status and its expansion plans:

> In connection with the expansion of our retail business, we originally intended to
> open 300 outlets by the end of fiscal year 2009. As at September 30, 2008, we
> have opened 110 outlets in Shanghai and 12 other cities in China (as of September
> 30, 2007, we had 22 retail outlets in Shanghai and Changchun). In the last two
> quarters, we have accelerated customer acquisition efforts and dedicated a
> significant amount of management efforts and production capacity for this
> purpose. With the limited production capacity that we have in our existing
> production facility, management believes that it is prudent to slow the pace of
> opening new retail outlets so that we can focus on completing the new plant on
> time and signing on customers to take up the capacity of our new plant when it is
> up and running. We now intend to open 300 outlets during fiscal year 2010.

99.     The following day on November 11, 2008, the Company issued a press release

discussing financial results for the second quarter of fiscal 2009.  The press release emphasized

the significant percentage increases in China-Biotics' financial results as well as management's

purported decision to proceed with expansion plans at a "measured pace":

> During the second quarter of the 2009 fiscal year, net sales increased 47.0% to
> $11.5 million from $7.8 million the prior year, as a result of growth in the sales
> volume of new products and increases in the sales price of selected products.
> Sales also benefited from an increase in the number of the Company's Shining
> retail outlets to 110 from 22 the prior year. New products, including Shining

Essence Stomach Protection Capsules, Shining Probiotics Protein Powder and other products accounted for 16.3% of total sales during the quarter, up from a combined 4.0% a year ago. Sales of bulk additives to commercial customers totaled $1.4 million, or 12.2% of sales, during the second quarter of 2009, up from $1.0 million, or 8.8% of sales, during the fiscal first quarter. There were no bulk additives sales in the second quarter the prior year.

* * *

**As of September 30, 2008, the Company had 339 employees and operated 110 Shining- branded retail outlets, up from 266 employees and 22 Shining outlets on September 30, 2007**.

* * *

With limited capacity in its existing production facility, management believes it is prudent to proceed with the retail outlet expansion at a measured pace, which will enable the Company to focus on the completion of the new manufacturing facility and signing on customers to fill production capacity once the new facility becomes operational. **As a result, the Company's plan to open a total of 300 Shining retail outlets is expected to be completed in the 2010 fiscal year**.

100.    In discussing the financial results for the second quarter of 2009, Defendant Song

stated:

We are delighted to see continued revenue growth in the second quarter, as we benefited from strong volume and price increases in our retail business and increased demand from our existing bulk additives customers.  **Our Shining retail outlet expansion resulted in an additional 27 openings during the quarter and should result in increased profits during the second half of the fiscal year**. As we prepare for the completion of our new manufacturing facility, we are carefully balancing existing production capacity between our retail expansion and bulk additive business development. **We signed one new bulk customer during the second quarter, and we remain in negotiations with more than 100 potential business clients**.

As we look to the second half of the year, **we continue to make great progress in our retail expansion strategy**, and we expect that our new manufacturing facility will come online during the fiscal third quarter.  We now have 22 Shining outlets that have been open at least one year, and all of these have demonstrated very strong growth year-over-year. … **The bulk additive business should continue to expand, as our new facility becomes operational and we are able to take on additional orders**.

31

ii.     **2009 False and Misleading Statements**

101.    On February 13, 2009, the Company filed a Form 10-Q with the SEC for the

period ending December 31, 2008, which was signed by Defendant Li.  The 10-Q reiterated

management's purported commitment to the Company's expansion plans:

> In connection with the expansion of our retail business, we originally intended to
> open 300 outlets by the end of fiscal year 2009. *As at December 31, 2008, we
> have opened 107 outlets in Shanghai and 12 other cities in China* (as of
> December 31, 2007, we had 27 retail outlets in Shanghai and Changchun). *In the
> last three quarters, we have accelerated customer acquisition efforts and
> dedicated a significant amount of management efforts and production capacity
> for this purpose*. With the limited production capacity that we have in our
> existing production facility, management believes that it is prudent to slow the
> pace of opening new retail outlets so that we can focus on completing the new
> plant on time and signing on customers to take up the capacity of our new plant
> when it is up and running. *We now intend to open 300 outlets during fiscal year
> 2010*.

102.    A few days later on February 16, 2009, China-Biotics issued a press release

emphasizing purportedly strong increases in financial results for the third quarter of fiscal 2009,

as well as reiterating its commitment to expansion in the number of the Company's retail outlets:

> During the third quarter of the 2009 fiscal year, net sales increased 32.5% to
> $15.8 million from $11.9 million the prior year.  Growth in revenues stemmed
> from increased sales volume of new products and changes in the Company's sales
> mix, as China-Biotics reaped the benefits of ongoing, targeted price increases on
> selected products. *Compared to the prior year, sales also benefitted from an
> increase in the number of the Company's Shining retail outlets to 107 from 27
> in the fiscal third quarter a year ago*.
>
> * * *
>
> *Management continues to balance current capacity against future sales growth
> and expects to resume the expansion of its Shining retail outlets at a moderate
> pace*. This should enable the Company to concentrate on the completion of the
> new manufacturing facility and the addition of new bulk additives customers to
> fill production capacity once the facility begins operations. *The Company
> remains confident in its plan to open a total of 300 Shining outlets during the
> 2010 fiscal year*.

103.    In discussing the Company's third quarter 2009 financial results, Defendant Song stated:

> *We again achieved solid sales and profit growth during the third quarter, as our bulk additives and retail expansion strategies continued to generate strong results.* During the quarter, we continued to balance current demand against future sales growth, adjusting our product pricing to maximize production capacity. We focused on fine-tuning our Shining retail outlet operations, closing one unproductive location and two sites where the Shanghai government is engaged in urban redevelopment. On the bulk additives side of the business, we added six additional food customers during the quarter, and we remain in negotiations with more than 100 potential business clients.

> *We continue to make progress in both the retail and commercial aspects of our business, with 107 Shining retail centers and eleven bulk additives customers.*

104.    Following this series of positive announcements, *PennyChaser.com* initiated coverage of the Company on June 26, 2009.  As a result, the Company's stock price increased $5.87 per share to close at $16.35 on this date.

105.    On July 14, 2009, the Company filed a Form 10-K with the SEC for the fiscal year ending March 31, 2009, which was signed by Defendants Song and Fan.  The Form 10-K reiterated the Company's purportedly strong financial performance and management's commitment to fixed expansion plans, including a substantial increase in the Company's sales staff:

> *As at March 31, 2009, we have opened 106 outlets in Shanghai and 12 other cities in China.*

> *In preparation for the opening of additional retail outlets, we have also been actively recruiting and training retail sales staff since the beginning of 2006.* We have already successfully recruited a number of very experienced sales professionals and have trained a pool of sales staff. We have also designed and implemented control systems to manage this new business.

> *Currently, we have a network of 106 outlets in China.* We continue to survey cities in China to assess and select suitable locations for new outlets.

33

As part of our strategy, we will also consider licensing franchisees to operate retail outlets in due course. We intend to finance the costs of our business expansion by our internal working capital.

106.    Regarding selling expenses, the Form 10-K provided the following:

*Selling expenses*:  Selling expenses were $6,869,109 or 16.2% of net sales for the fiscal year ended March 31, 2008 compared with $4,502,687 or 14.7% of net sales for the fiscal year ended March 31, 2007. The operating costs of the retail outlets are included as selling expenses. This increase in selling expenses was primarily caused by the roll out of retail outlets. As of March 31, 2008, we had a total of 60 retail outlets in operation (as of March 31, 2007, we had 9 retail outlets).

107.    The next day, on July 15, 2009, the Company issued a press release discussing financial results for the fourth quarter and fiscal year 2009.  The press release stated in pertinent part as follows:

During the fourth quarter of the 2009 fiscal year, net sales increased 18.9% to $15.5 million from $13.1 million a year ago. ***The increase resulted from significant growth in the sales of new products, most of which were sold in the Company's Shining-branded retail outlets***, and growth in the bulk additive business. The Company's established retail outlets and well-trained sales assistants contributed to the rapid revenue growth …

108.    In discussing the Company's financial results for the fourth quarter and fiscal year for 2009, Defendant Song stated:

Same-store sales for Shining retail stores that have been in operation at least one year are expected to grow significantly year-over-year, and we hope to continue to expand the number of Shining retail outlets during the year. Although global economic growth remains suppressed, we believe there is pent-up demand for our bulk additive products, ***which should generate substantial growth in revenues and net income during the 2010 fiscal year***.

109.    On August 14, 2009, the Company filed a Form 10-K with the SEC for the period ending June 30, 2009, which was signed by Defendant Song.  The Form 10-K reiterated the Company's expansion plans and development activities:

In connection with the expansion of our retail business, we originally intended to open 300 outlets by the end of fiscal year 2009. ***As at June 30, 2009, we have***

*opened 107 outlets in Shanghai and 12 other cities in China* (as of June 30, 2008, we had 27 retail outlets in Shanghai and Changchun). During the quarter ended on June 30, 2009, we put emphasis on the development of our new bulk additives line, in preparation for the commencement of the new plant. With the limited production capacity that we have in our existing production facility, management believes that it is prudent to slow the pace of opening new retail outlets so that we can focus on completing the new plant on time and signing on customers to take up the capacity of our new plant when it is up and running.

110.    A few days later on August 17, 2009, the Company issued a press release discussing its first quarter 2010 fiscal results.  The press release touted the Company's purported increases in financial figures and cited its network of retail outlets as a source for the significant growth:

During the first quarter of the 2010 fiscal year, net sales increased 35.5% to $15.4 million from $11.4 million a year ago. *The increase resulted from an increase in sales volume from new products, most of which were sold in the Company's Shining-branded retail outlets*, significant growth in the bulk additive business and sales price increases on bulk additives products.

111.    In discussing the financial results for the first quarter of 2010, Defendant Song stated:

We look forward with anticipation to the remainder of fiscal 2010. Our new manufacturing facility remains on track to begin trial production in the second quarter of fiscal 2010, as previously announced, and our pipeline of potential new bulk additives customers continues to be strong.

As the new capacity comes online, we will be able to resume our Shining retail outlet expansion later in the fiscal year. *We are already directing our attention to the second phase of the capacity expansion, which we expect to begin by December 31, 2009. Although global economic growth remains suppressed, demand for our bulk additive products has been significant. This should result in revenue growth of at least 50% during the 2010 fiscal year*.

112.    A few days later, EVA Dimensions upgraded China-Biotics stock to a "Hold" rating on August 20, 2009.  On this date, the Company's stock increased $1.74 to close at $14.76.

35

113.    On October 15, 2009, as a result of the Company's repeated issuances of positive statements concerning its financial results and future growth expectations, Defendant Maxim Group issued a "Buy" rating for China-Biotics stock along with a price target of $24.

114.    On September 30, 2009, the Company issued a press release announcing that it had priced the SPO at $15.00 per share, with expected proceeds of approximately $69 million overall.  In discussing the purpose of the SPO, the press release stated in part:

> The Company expects that the offering will yield net proceeds, before expenses, of approximately $65,550,000 million and intends to use the net proceeds from the sale of the securities for general corporate purposes, including expanding its retail operations, expanding its products, acquiring additional retail outlets and for general working capital purposes. "***We are pleased to execute this public offering, and intend to use the proceeds to further enhance and develop our business***," said Mr. Jinan Song, Chairman and Chief Executive Officer of China-Biotics.
>
> Roth Capital Partners, LLC, acted as the sole manager of the offering. In connection with the offering the Company also granted the underwriters a 30-day option to purchase up to an additional 690,000 shares to cover over-allotments, if any. The offering is expected to close on or about October 5, 2009.

115.    On October 5, 2009, the Company issued another press release stating that the September 2009 Offering had closed, and had resulted in net proceeds of $65.5 million after deduction of underwriting discounts and commissions.

116.    Soon after the consummation of the SPO, China-Biotics issued a press release on October 23, 2009, which unexpectedly announced that the Company's CFO, Defendant Fan, had resigned effective October 21, 2009.  After the announcement of Defendant Fan's resignation, the Company's stock price fell $2.00 per share to $14.42 on October 23, 2009.  However, China-Biotics' stock price remained inflated due to Defendants' repeated false and misleading statements concerning the Company's business and operations.

117.     On November 16, 2009, China-Biotics filed a Form 10-Q with the SEC for the

period ending September 30, 2009, which was signed by Defendant Song.  The Form 10-Q

discussed the Company's operational status and its emphasis on developing a new bulk additives

line:

> **As at September 30, 2009, we have opened 107 outlets in Shanghai and 12 other**
> **cities in China** (as of September 30, 2008, we had 110 retail outlets). During the
> quarter ended on September 30, 2009, we put emphasis on the development of our
> new bulk additives line, in preparation for the commencement of the new plant.
> With the limited production capacity that we have in our existing production
> facility, management believes that it is prudent to slow the pace of opening new
> retail outlets so that we can focus on completing the new plant on time and
> signing on customers to take up the capacity of our new plant when it is up and
> running.

118.     The next day on November 17, 2009, the Company issued a press release

discussing its financial results for the second quarter of fiscal year 2010, as well as the results of

the Company's successful SPO completion.  The press release provided in pertinent part as

follows:

> Operating expenses were $4.6 million, compared to $4.2 million a year ago. The
> increase in operating expenses during the second quarter of fiscal 2010 was
> primarily due to an increase in legal and professional fees associated with
> preparation for public offerings. Selling expenses for the second quarter of 2010
> were $2.7 million, or 15.9% of sales, down from $2.8 million, or 24.5% of sales,
> in the year ago period. The decline in selling expenses was the result of the
> closure of three Shining retail outlets in early 2009 calendar year due to local
> community redevelopment.
>
> * * *
>
> In October, China-Biotics completed an underwritten public offering of 5,290,000
> shares of its common stock at a price of $15.00 per share, including the exercise
> of the underwriters' over-allotment option, generating net proceeds of
> approximately $75.4 million. The Company expects to use the net proceeds from
> the offering for general corporate purposes, including expanding its retail
> operations, expanding its products, acquiring additional retail outlets and for
> general working capital purposes.

37

119.    In discussing the Company's financial results for the second quarter of fiscal year

2010, Defendant Song stated:

> We look forward with anticipation to the remainder of fiscal 2010 and are excited
> about the traction we are gaining in our bulk additives business. Our new
> manufacturing facility is expected to begin commercial production in the first
> quarter of calendar year 2010, and our pipeline of potential new bulk additives
> customers continues to be strong.  ***As the new capacity comes online, we will be
> able to resume our Shining retail outlet expansion later in the fiscal year. We
> are already directing our attention to the second phase of the capacity
> expansion, which we expect to begin by December 31, 2009***. Demand for our
> bulk additive products has been significant, ***which should result in revenue
> growth of at least 50% during the 2010 fiscal year***.

### iii.    2010 False and Misleading Statements

120.    On February 11, 2010, the Company filed a Form 10-Q with the SEC for the

period ending December 31, 2009, which was signed by Defendant Song.  The Form 10-Q

provided in pertinent part as follows:

> ***As at December 31, 2009, we have opened 111 outlets in Shanghai and 12 other
> cities in China*** (as of December 31, 2008, we had 107 retail outlets). During the
> quarter ended on December 31, 2009, we put emphasis on the development of our
> new bulk additives line, in preparation for the commencement of the new plant.
> With the limited production capacity that we have in our existing production
> facility, management believes that it is prudent to slow the pace of opening new
> retail outlets so that we can focus on completing the new plant on time and
> signing on customers to take up the capacity of our new plant when it is up and
> running.

121.    In a press release issued on February 10, 2010 discussing the Company's third

quarter fiscal 2010 financial results, Defendant Song stated the following:

> ***Our robust fiscal third quarter revenue and earnings growth reflect the
> Company's continued expansion of our bulk and retail customer bases*** . . .
> Commercial production at our Qingpu production plant is scheduled to begin by
> the end of February and we continue to expect to reach approximately 50%
> capacity utilization by the end of calendar year 2010. With rising demand from
> the dairy and animal feed manufacturers, and movement by the government to
> encourage the use of probiotics, ***China continues to be a very favorable
> environment to grow our bulk and retail probiotics business in 2010 and
> beyond***.

38

122.    In response to these positive announcements, the Company's stock price

increased $1.49 per share to close on February 11, 2010 at $14.74 per share.

123.    On June 11, 2010, China-Biotics issued a press release discussing financial results

for the fourth quarter fiscal year 2010 and annual results for fiscal year 2010.  In commenting on

these results, Defendant Song stated:

> With our established state-of-the-art facility in Shanghai and our growing capacity
> utilization, *we believe that we are well positioned to ride the wave of rising
> market demand and increasing government support for probiotics. We will
> continue to broaden our distribution network as well as diversify our retail
> portfolio through launching new products*. We also look forward to winning
> more bulk customers as we have received encouraging feedback from potential
> customers during the initial trial period.

124.    On June 14, 2010 the Company filed a form 10-K with the SEC discussing

financial results for fiscal year 2010 ended March 31, 2010, which was signed by Defendants

Song and Cai.  The Form 10-K noted a cash balance of $159.7 million for the Company and

provided the following regarding the Company's expansion of its retail outlet network:

> *We intend to expand the sale of our retail products to the other metropolitan
> cities in China through a combination of traditional distribution channels and
> dedicated Shining outlets. We have a total of 111 outlets as of March 31, 2010*.
> About three quarters of these outlets are located in Shanghai, and the rest are
> located in 12 other cities in China. With respect to our bulk additives business, we
> have secured 31 bulk additives probiotics customers nationwide in tier-one urban
> areas such as Beijing and Shanghai, as well as inland provinces such as Qinghai
> and Inner Mongolia…

125.    Regarding selling expenses, the Form 10-K provided the following:

> *Selling expenses were $13,535,225 or 16.6% of net sales for the fiscal year
> ended March 31, 2010, compared with $11,563,012 or 21.3% of net sales for the
> fiscal year ended March 31, 2009. The operating costs of the retail outlets are
> included as selling expenses*. This increase in selling expenses was primarily
> caused by increase of overall sales. As bulk additives products account for a
> larger share of revenue and selling expense associated with bulk additives
> products are smaller than that of retail products in this fiscal year, the selling
> expenses as a percentage of revenue decreased.

* * *

Selling expenses were $11,563,012 or 21.3% of net sales for the fiscal year ended March 31, 2009 compared with $6,869,109 or 16.2% of net sales for the fiscal year ended March 31, 2008. The operating costs of the retail outlets are included as selling expenses. ***This increase in selling expenses was primarily caused by the roll out of retail outlets. As of March 31, 2009, we had a total of 106 retail outlets in operation*** (as of March 31, 2008, we had 60 retail outlets).

126.    The Form 10-K provided a summary of the costs the Company stated it had incurred for rental expense for its retail stores for the previous three fiscal years: "Rental expense, which was charged to expense, amounted to $3,906,098, $3,363,300, $990,300 for the years ended March 31, 2010, 2009 and 2008, respectively."

127.    On August 9, 2010, the Company filed a Form 10-Q with the SEC for the period ending June 30, 2010, which was signed by Defendants Song and Cai, and stated in part:

> ***As of June 30, 2010, we have 27 distributors for retail products, and we are operating 103 retail outlets in China*** (as of June 30, 2009, we had 107 retail outlets).  During the quarter ended June 30, 2010, we added 1 distributor for retail products and closed 8 retail outlets, as we believe selling retail products through our distribution network is a more efficient way to grow our retail market.  We have been hiring consultants who have many years of experience in the direct selling industry to facilitate the development of the Shining brand outlets.  We are also creating a "Community Network" through which we continuously provide training and seminars to educate the public about becoming more health conscious and about the benefits of probiotics and the Shining products.

128.    As shown above, Defendants engaged in a concerted course of conduct throughout the Class Period to provide the materially false and misleading appearance that China-Biotics was implementing a robust business strategy—a strategy that would lead to the significant expansion of the Company's operations and elevate it to become the "dominant" player in China probiotics.  When the truth concerning China-Biotics actual financial and operational state began to leak into the market, however, the Company's stock plummeted, resulting in millions of dollars of losses for its shareholders.

D.   **REASONS FOR FALSITY**

129.   China-Biotics' statements and filings during the Class Period discussed above were materially false and misleading because they failed to disclose and misrepresented the true nature and scope of the Company's business, financials and operations.  Defendants failed to disclose material adverse information regarding the Company, including, among other things, the following:

(i)    China-Biotics had substantially inflated the number of retail outlets it operated in its business, and thus the Company had never established itself as a leading supplier and manufacturer of probiotics products in China;

(ii)   The Company had substantially exaggerated its expansion plans and thus had no sustainable plans to reach a maximum number of 300 retail stores by the end of fiscal year 2010 because China-Biotics had inflated the number of retail outlets in its operation;

(iii)  Many of the "retail outlets" that the Company suggested were stand-alone, Company-brand stores were actually supermarkets or drugstores where China-Biotics products were not sold, or where only one or two products on a shelf were actual Company products;

(iv)   The Company had failed to disclose how many of its stores were still open and operational, how many were four-walled exclusively branded stores, and which were in booths or kiosks in larger stores;

(v)    Because of the Company's exaggerated expansion plans, China-Biotics' statements concerning active recruiting and training of retail sales staff, along with the number of retail employees under its corporate umbrella, were inaccurate and misleading;

(vi)   The Company misrepresented its clientele the quality and membership of its clientele, as well as the size and scale of its sales force;

(vii)  The Company had failed to disclose why it was discontinuing its retail store business if—as Defendants had repeatedly claimed during the Class Period—the Company's retail stores were so profitable that expansion plans were underway and the outlets each had a "one-year payback"

(viii) China-Biotics' purported plans to use the proceeds from the SPO to fund expansion, facilitation of direct sales products to customers, strengthening of product pipelines, and expansion of sales through dedicated Shining outlets, were exaggerated and, in some cases, completely fabricated;

(ix)    The Company's reported financial figures in the press releases and filings detailed above did not match up with the comparable financial results the Company reported to the Chinese SAIC and, as a result, were wholly inaccurate and misleading;

(x)    The Company bolstered its U.S. financial figures through embellished lease expenses, cash amounts, and tax information that did not match with information reported to Chinese authorities or to a company that operated only six or seven actual retail stores as opposed to the 100+ that it represented in its SEC filings;

(xi)    China-Biotics failed to address the striking differences and irregularities between its SEC filings and its SAIC reports, or information on the individuals responsible for providing data to the SAIC and the SEC;

(xii)    China-Biotics failed to disclose that it was operating under inadequate auditing and financial reporting standards;

(xiii)    The Company failed to disclose that its financial statements and filings were not prepared in accordance with Generally Accepted Accounting Principles; and

(xiv)    As a result of the above, the Company's statements and omissions concerning its business, operations and future growth were materially false and misleading and lacking in any rational basis when made.

130.    The scope of Defendants' misrepresentations and omissions is daunting and affects nearly every aspect of the Company's business and operations.  The revelation of Defendants' fraud began in late August 2010 with the publication of a research report by Citron Research.  While Defendants attempted to brush aside the allegations in this report as the manipulations of a short seller, investors and analysts worldwide would soon join in the calls for China-Biotics to admit what was becoming painfully obvious to anyone who investigated the Company: Defendants had perpetrated a long-running scheme that had defrauded the investing public of millions of dollars.

E.    **THE TRUTH COMES TO LIGHT**

i.    **The Citron Research Reports**

131.    On August 30, 2010, the first major exposure concerning the falsity of Defendants' statements concerning China-Biotics' business came to light when Citron Research,

run by analyst Andrew Left, issued a research report entitled, "It Doesn't Take a Microscope to See What's Wrong with China-Biotics." Citron Research conducts investigations of companies that are suspected of misleading investors. While Citron's reports are sometimes attacked as short-selling manipulations, Citron has a track record of uncovering corporate frauds and major publications such as *Barron's*, *The Wall Street Journal*, and CNBC often cite to Andrew Left's work. In its reports on China-Biotics, Citron's findings were based on reports from private investigators in China, photos and surveys of actual and purported store locations, and interviews with employees of the Company.

132.   The Citron report issued on August 30, 2010 summarized Citron's startling findings in its analysis of China-Biotics' claims regarding its operations, including, among other things: (i) the existence of "gross discrepancies between the company's SAIC and SEC filings"; (ii) "pictures of the half-finished over-budget manufacturing facility side-by-side with company claims that it was already in production"; (iii) "photos of [China-Biotics'] current production facilities the size of a bathroom where the acidophilus pills drop out of a machine two by two"; (iv) questions concerning the veracity of the Company's claims that its EBITDA margins are 40-45% when their multinational competition is at "27% max"; (v) the fact that the Company had hired and replaced five CFOs in a four-year span; and (vi) the impact of the Company's financial commitments and tax liabilities that could reach as high as $100 million.

133.   Most importantly, the Citron report blasted the Company's statements concerning its retail outlet network. The report contained the following chart detailing China-Biotics' purported retail store growth since it completed its reverse merger in March 2006:



134.    Since China-Biotics disclosed that "about three quarters of these outlets are located in Shanghai and the rest are located in 12 other cities in China," Citron expected "that the company has at least 70 outlets in Shanghai."  However, Citron's investigation reported that it could find "only 6 or 7 stores in Shanghai, and one each in Xeitu, NanMatou, Jingyu, Zhang YangLu, LingNan, FengZhuang."  Moreover, Citron cited other investors that report "they have been unable to find any sign of even 25 locations, let alone over 100."  The report also noted that, despite repeated inquiries, China-Biotics failed to provide the addresses of any of their retail outlets.

135.    After the announcement of the Citron report, the Company's stock plunged over 18%, or $2.66 per share, to close at $12.03 per share on August 30, 2010.

136.    In response to the Citron report, China-Biotics released a list of its store addresses in an attempt to stave off the negative publicity.  However, in addition to releasing this list, the Company notably changed its website to eliminate the word "stores" from its home page.  This can be verified by using the Wayback Machine (http://web.archive.org), a digital service that enables users to see archived versions of web pages across time.  By using the Wayback Machine to access an archived version of the China-Biotics website from May 2009, users can see that the website used to state that the Company's "most recognizable" customers included

44

Bright Dairy and Relax Xinqiao, and that the Company had plans to expand its retail network to as many as "300 Shining brand retail centers in the next two years."

137.    However, essentially admitting the false and misleading nature of the prior statements, the Company changed its website shortly after the claims and allegations regarding fraud were exposed.  Today, the Company's website contains no statements regarding its supposed expansion of retail stores, nor its "most recognizable customers," instead only stating general information about the Company's products.[5]

138.    On August 31, 2010, Citron continued questioning the veracity of China-Biotics' disclosures regarding its retail outlets and stores by publishing a second reporting highlighting the lack of existing China-Biotics stores and responding to the Company's release.  Indeed, the list of stores that the Company released was wholly inaccurate, as a majority of the 100 locations it published were not in fact company stores, but were actually supermarket locations mostly around the Shanghai area.[6]  The second Citron report discussed the Company's misleading disclosures as attempting to equate small shelf space in a supermarket to freestanding retail locations filled with the Company's products.

---

[5] For reference, the Wayback Machine's archived version of the Company's website is located at the following:  http://replay.web.archive.org/20090520125213/http://chn-biotics.com/c4426/c4435/default.html.  The current version of the Company's website is:  http://chn-biotics.com/.

[6] For example, the Company's first listed location , 62 Wensu Road, Jiading District, is this Jiadeli Supermarket, a chain of over 140 stores.  Further down the page is "Jiading District, 420 Yumin Road," which is Jiadeli Supermarket #59.  At least 10 other locations listed on the company's website are found on this single listing of supermarkets in the greater Shanghai metro area:  http://webcache.googleusercontent.com/search?q=cache:z6eRGG1ewnwJ:chinauniquetour.com/html/Shanghai/2009423/arts-5808.html88Baode&cd=5&hl=en&ct=clnk&gl=us.

139.    On September 10, 2010, China-Biotics issued a press release entitled "China-Biotics, Inc. Comments on Market Rumors."  In the press release, the Company purportedly confirmed an "organized effort to distribute false rumors" and stated that it "suspects this is motivated by short selling interest in the Company's stock."  The Company stated that the messages are false and that it had not provided false disclosures to the investing public.

140.    On September 14, 2010 Citron published a third report questioning the Company's operations, and providing additional information concerning China-Biotics' retail outlets.  Notably, in this report, Citron stated that 43 of the Company's purported 111 retail outlets (as of June 2010) had been surveyed with photos.  The Citron report stated the following: (i) only two of these 43 stores were Company retail outlets similar to the stores pictured on the Company's website; (ii) 16 of the 43 "stores" were supermarkets or drugstores carrying one or two China-Biotics products on a small shelf space; (iii) 17 of the 43 "stores" offered no China-Biotics products whatsoever; and (iv) eight of the 43 "stores" featured no retail business at that address at all.  This report also questioned how the Company could only report $87,876 in interest while stating that it had $159.7 million in cash as of June 2010.

ii.    **Analysts and News Sources Expose and Downgrade China-Biotics**

141.    Following this series of announcements, several analysts, including the Company's own underwriter for the SPO, began releasing reports questioning the veracity of China-Biotics' statements concerning its business operations and downgrading the Company's future outlook.

142.    For instance, on September 21, 2010, Roth Capital, China-Biotics underwriter for the SPO, abruptly downgraded the Company's stock from "Buy" to "Sell" without any intermediate ratings, and put a twelve month target price for the Company's stock at a mere

$8.00 per share.  Roth Capital issued various reports discussing reasons for this decision, stating that it believed the Company's "revenue shortfall, along with margin contraction indicate[d] growth headwinds.  Furthermore, the overhaul in its retail operation during the quarter presents uncertainty."  Roth Capital also stated that it was concerned because "88 retail outlets were closed during 2Q with 15 remaining, down from 103 in 1Q and 107 a year ago."  Furthermore, Roth had hesitations regarding "the effectiveness of the Company's sales network" and analysts felt that an "asset-based valuation [was] appropriate, in light of 1) lack of clarity in retail operations; 2) slower bulk growth; and 3) margin deterioration."

143.    On November 8, 2010, Citron published numerous additional concerns concerning China-Biotics' suspected fraudulent issues that remained unaddressed and unexplained, such as: (i) the Company had failed to disclose why it was discontinuing its retail store business if—as Defendants had repeatedly claimed during the Class Period—the Company's retail stores were so profitable that expansion plans were underway  and the outlets each had a "one-year payback"; (ii) the Company had failed to disclose how many of its stores were still open and operational, how many were four-walled exclusively branded stores, and which were in booths or kiosks in larger stores; (iii) the Company had failed to disclose the blended margins of the Company's distribution network; (iv) the Company had still not made available documents that had been given out on "Investor Day" in Shanghai in June 2010,  so that all investors could view the tax documents, bank statements, and lease agreements that were supposedly presented to participants; and (v) the Company failed to address the striking differences and irregularities between its SEC filings and its SAIC reports, or information on the individuals responsible for providing data to the SAIC.

144.    Various other analysts in addition to those at Citron Research and Roth Capital further commented on the irregularities between China-Biotics' SAIC filings compared with the Company's SEC filings.

145.    For instance, in an article published on *SeekingAlpha.com* on August 31, 2010 and entitled "China-Biotics vs. Spreadtrum Communications: Why AIC Filings Matter," the author compares China-Biotics' SEC and SAIC filings and discovers troubling indicators that China-Biotics is "fabricating their SEC financials."  The article reports that the Company's SAIC "***report and financial statements…indicate a company that is far smaller than its SEC filings indicate…generating less than one-tenth of its SEC-reported revenue***."  Moreover, the Company's SAIC filings "show revenue of less than $1m in 2007 and 2008.  This compares to SEC-reported revenue of $31m in 2007 and $42m in 2008.   CHBT's [SAIC]-reported total assets were $7m and $9m, compared to $45m and $94m in its SEC filings."  The article also noted the interrelated nature of the Company's executives, as the "shareholders of the company in the AIC filings are Song Jin'an, Yan Li, Huang Weida, and Yan Yihong. Jin'an is the current CEO, Li is his wife, Yihong is her sister."

146.    On January 16, 2011, Xia Cao—a well-known Chinese analyst and respected teacher at the Shanghai National Accounting Institute who was the first to challenge 25 of the 125 companies that the Chinese Securities Regulatory Commission has pressed charges against—issued a report discussing the irregularities in China-Biotics' financial reporting and "abnormal activities" in the Company's reported financial and tax figures.  The report calculated that the amount of value added tax amounts to $50.42 million, and that, in other words, the Company "owes taxes on 60% of the total taxes payable over an operation span of six and a half years."  The report analyzes the Company's tax and financial figures and concludes that the

Company "*is involved in fabricating its five years of reported profits, causing massive tax liabilities, and also massively inflated cash balances as a result*."

147.    Other Chinese analysts and news sources have also begun to challenge the accuracy of the Company's financials.  For instance, well-known and reputable Chinese business newspaper *First Financial Daily*, which aims to be the most influential, authoritative, and respected financial daily newspaper in China and is often compared to *The Wall Street Journal*, published an article on January 21, 2011discussing the Company's questionable activities and financial reporting.  The article reported on an investigation of China-Biotics conducted by the newspaper, which found that the financial figures in the Company's SEC filings as well as the statements concerning the number of the Company's retail outlet stores were exaggerated.  When a reporter interviewed employees at one retail center, the employee indicated that the Company only had six stores open, rather than the 100+ stores that the Company had been representing in its U.S. filings.

148.    On January 26, 2011, Citron released another report discussing the developments with the Company and the Chinese analyst articles questioning the Company's legitimacy.  After summarizing the articles and investigations discussed above, the report stated that China-Biotics' "stores don't check out, their 'distribution chain' doesn't check out, and their 'major customers' don't check out."

149.    On February 10, 2011, a *SeekingAlpha.com* article entitled, "China-Biotics: Record Earnings Don't Negate Five Unresolved Issues," reported that, in regards to the Company's claims of operating over 100 retail outlets and its past publication of a list of addresses of some outlets, "[o]fficial websites by the real tenants of many of these locations were

found, ***proving that the addresses in question were not China-Biotics retail outlets***."[7]

Moreover, photos taken by investigators in China verified that a majority of the China-Biotics

purported retail outlets were "missing."[8]  The also report quoted a manager interviewed by an

investigative news reporter who expressed surprise that the Company had stated it operated over

100 stores, claiming: "Form what I know, we don't have that many stores."

150.   The report also questioned how a company with a large cash balance, as China-

Biotics purportedly held, could generate such low interest figures.  In fact, during a conference

call, the Company responded to a caller's question regarding the small interest by stating that

management is "in a process of implementing a program."

151.   The existence of China-Biotics' retail outlets has been further called into question

with the creation of a website dedicated to determining whether the purported hundreds of stores

exist.  The website, located at www.therealchbt.com, contains multiple pictures and addresses

compiled by private investigators, which test the veracity of the Company's claims that it has

retail outlets.   For instance, the homepage of the website states in pertinent part:

> Welcome to "The China-Biotics Store Verification Website". We have set up this
> website to provide evidence that China-Biotics has lied about its store base, and
> that its alleged 100stores do not actually exist. ***We believe that China-Biotics is
> falsifying its SEC financial statements.***
>
> * * *
>
> The company's list of locations provides 80 locations. 1 of these locations is a
> repetition of a previous location, leaving 79 independent locations. ***We visited 43
> of these locations. We found a China-Biotics store at 2 of these 43 locations.
> The remainder of the addresses were supermarkets, hotels, office buildings and
> empty lots. There were no China-Biotics stores or kiosks inside the larger
> stores. There were China-Biotics products located on shelves at 18 of the 43
> locations we visited.***

---

[7] *See* http://seekingalpha.com/instablog/582827-matt-berry/129274-china-biotics-testimony-forensics-and-the-case-of-the-missing-retail-outlets.

[8] *See* http://www.therealchbt.com/.

152.     The article further discussed China-Biotics' materially false and misleading statements concerning its financial figures and operations, including that it has over 200 full-time employees, that its nearly $7 million in operating costs for retail stores reflect a total of 60 stores as of March 31, 2008, and that it has over $3 million in lease expense for fiscal years 2009 and 2010.

153.     This website goes on to give actual pictures of all of the Company's alleged "stores" to show that the Company has very little to no actual shelf space, much less existing stores, and that the Company's disclosures regarding its hundreds of stores are complete falsities. While some locations either did not exist, were residential locations or were retail locations with absolutely no connection to China-Biotics products at all, the retail locations that did sell China-Biotics merchandise included only one or two Company products, such as the photo shown below:[9]



---

[9] For a full compilation of the photos and captions from www.therealchbt.com regarding the purported existence of the Company's retail stores, please see Exhibit A.

154.     In many cases the addresses that the Company provided were to empty parking lots or run down residential buildings.  The photos compiled by investigators demonstrate that the Company's actual retail outlet network is a far cry from the robust network of over 100 stores repeatedly espoused in China-Biotics statements during the Class Period.

155.     On March 15, 2011, *SeekingAlpha.com* published another article discussing China-Biotics' apparent inflated revenues and earnings reports.  The article stated in pertinent part as follows:

> Following comprehensive analysis of public information and extensive on-the-ground due diligence, *we believe China Biotics (CHBT) may have fabricated revenues and earnings reported to U.S. regulators.*
>
> 1. We believe the claimed distribution channels for its retail products in the Shanghai market are *wildly overstated*, and that the products themselves are not popular enough to justify reported revenue figures.
>
> 2. The firm's Shanghai production facility appear [sic] not to be large enough to generate the implied output of retail products.
>
> 3. *All bulk additives customers named by the company denied the existence of any business relationship.*

156.     The theme is troubling and consistent: at every step of the way, investors and analysts alike find nothing but inconsistencies and omissions when reviewing China-Biotics financials and operational figures.  This was true even of one overseas investor who conducted her own investigation of the Company and came away convinced that a massive fraud had taken place.

### iii.     The Confidential Witness Investigation

157.     One investor, Confidential Witness 1 ("CW1"), conducted his own investigation as to the Company's fraud.  CW1 has owned China-Biotics stock since approximately 2008.  CW1 stated that on December 23, 2008, the Company had issued a press release discussing trial

production at its new facility would begin in January 2009.   CW1 was scheduled to go to visit

China-Biotics in January, and when he did, he noticed that the location was not in fact under

construction—the equipment was not even on order until late March 2009.

158.   CW1 contacted the Company's management to express his concerns over these

construction issues.  The Company thanked CW1 for his  concern, and issued the following press

release on January 14, 2009:

> The Company also announced that it has experienced an unexpected delay in the
> construction of its new facility. The new plant needs to be certified by two local
> government bureaus, which are State Food and Drug Administration and
> Shanghai Municipal Bureau of Quality and Technical Supervision, each of which
> requires a different certification standard for our manufacturing facility.
> Management has been working closely with these agencies to resolve which
> standard will be required for the new facility. As a result of this delay, the
> Company has slowed down the installation process at the new facility. The
> Company expects that a consensus will be reached shortly. We will resume
> installation after the Chinese New Year, and plan to commence trial production in
> April. The trial phase should be completed in approximately three months.

159.   Further, on May 26, 2009, CW1 stated that the Company had issued a press

release highlighting its attendance at Digestive Diseases Week, a well-known conference in

Chicago, Illinois.  The press release from the Company stated in pertinent part:

> "We are excited to attend this important industry event, which we believe will
> enhance our profile with scientists and medical professionals in North America,"
> said Mr. Jinan Song, Chairman and Chief Executive Officer of China-Biotics.
> "We look forward to leveraging this tremendous platform to enhance our
> visibility in the international community."

160.   However, CW1 had an informant in Chicago go to this conference to verify that

the Company was in fact in attendance.  Alarmingly, the informant found that there was no such

presentation, and called China-Biotics' management, who informed him that the Company had

decided to instead put up posters (due to "sticker shock").  The informant was never able to

locate said posters.

161.    Despite this, on July 15, 2009, the Company issued the following press release, which stated, in part:

> In June 2009, China-Biotics attended Digestive Disease Week 2009 in Chicago. DDW is the largest and most prestigious meeting in the world for gastrointestinal professionals in the fields of gastroenterology, hepatology, endoscopy and gastrointestinal surgery, attracting approximately 16,000 physicians, researchers and academics from around the world.

162.    As demonstrated above, myriad analysts, investors and commentators who have reviewed the publicly available information and conducted their own independent investigations of the Company have come away with the same conclusion: China-Biotics fraudulently misrepresented their business, financials and operations to the SEC and the investing public in order to inflate its stock price and capitalize on the lucrative American investor market.  As a result of Defendants' wrongful course of conduct, China-Biotics shareholders have lost millions of dollars in their investment in the Company.

## VII.    DEFENDANTS' VIOLATIONS OF ACCOUNTING RULES

163.    As discussed above, China-Biotics financial statements and filings with the SEC during the Class Period were materially false and misleading and were not prepared in accordance with GAAP.  In doing so, Defendants violated numerous accounting standards, including those discussed below.

164.    Generally accepted accounting principles ("GAAP") state that, in keeping with the principle that accounting is primarily based on cost, there is a presumption that inventories should be stated at cost. The definition of cost as applied to inventories is understood to mean acquisition and production cost. (ARB No. 43, Ch. 4; FASB ASC 330).

165.    As alleged above, China-Biotics' financial statements that were disseminated to the investing public during the Class Period did not reflect inventories on hand and inventory

sold (cost of sales) presented at cost.  They reflected the dollar value of materially inflated quantities.  (SEC Staff Accounting Bulletin No. 99; FASB ASC 250).

166.    GAAP states that profit is deemed to be realized when a sale in the ordinary course of business is effected (Accounting Research Bulletin No. 43), which is ordinarily the time a transaction is completed (APB Opinion No. 10; FASB ASC 605).  The doctrine that revenue is to be accounted for at the time that the earnings process is complete is a well-established principle of GAAP and it has been reaffirmed by the SEC on numerous occasions.

167.    For example, it was reaffirmed by the SEC in Accounting And Auditing Enforcement Release No. 817 which states:

> Under APB Statement No. 4, which was rescinded in March 1993, revenue was generally recognized when (1) the earnings process was complete or virtually complete, and (2) an exchange had taken place. This revenue recognition concept has been carried forward in FASB Statement of Financial Accounting Concepts No. 5, para. 83-84, and in other authoritative literature and continues to provide the foundation for revenue recognition in accordance with GAAP.

168.    The SEC reaffirmed this basic accounting doctrine in its Staff Accounting Bulletin No. 104 as follows:

> The accounting literature on revenue recognition includes both broad conceptual discussions as well as certain industry-specific guidance. If a transaction is within the scope of specific authoritative literature that provides revenue recognition guidance, that literature should be applied. However, in the absence of authoritative literature addressing a specific arrangement or a specific industry, the staff will consider the existing authoritative accounting standards as well as the broad revenue recognition criteria specified in the FASB's conceptual framework that contain basic guidelines for revenue recognition. Based on these guidelines, revenue should not be recognized until it is realized or realizable and earned. Concepts Statement 5, paragraph 83(b) states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." Paragraph 84(a) continues "the two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from

manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)."

169.    By recognizing sales revenue and income on fictitious sales as alleged above, each of the Company's financial statements which were disseminated to the investing public during the Class Period violated the foregoing accounting principles.  Moreover, each of the above particularized financial statements were not presented in accordance with GAAP in that neither the financial statements nor the notes thereto contained any disclosure of the fact that the Company falsely recognized fictitious revenue.  (APB Opinion No. 22; FASB ASC 235).

170.    Defendants knew and ignored all of the foregoing and knowingly permitted the Company to materially overstate its reported revenue, earnings, assets, and net worth in each of the financial statements that were disseminated to the investing public during the Class Period.

171.    Due to the Company's fraudulent accounting and its failure to make those disclosures which were necessary to make the Company's financial statements during the Class Period not misleading, the overall impression created by these financial statements was inconsistent with the business realities of the Company and, as a result, they were deceptive and materially misleading.

172.    The Company's Form 10-Q for the quarterly period ended June 30, 2008 contained certifications signed by Defendants Song and Li, which stated:

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

* * *

The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

173.   The following documents filed by the Company with the SEC also contained language substantially similar to the certification language found in the Form 10-Q for the quarterly period ended June 30, 2008, above:

(a)   the Company's Form 10-Q for the quarterly period ended September 30, 2008, signed by Defendants Song and Li;

(b)   the Company's Form 10-Q for the quarterly period ended December 31, 2008, signed by Defendants Song and Li;

(c)   the Company's Form 10-K for the fiscal year ended March 31, 2009, signed by Defendants Song and Fan;

(d)   the Company's Form 10-Q for the quarterly period ended June 30, 2009, signed by Defendants Song and Fan;

(e)   the Company's Form 10-Q for the quarterly period ended September 30, 2009, signed by Defendants Yihong and Song;

(f)   the Company's Form 10-Q for the quarterly period ended December 31, 2009, signed by Defendants Cai and Song;

(g)   the Company's Form 10-K for the fiscal year ended March 31, 2010, signed by Defendants Cai and Song; and

(h)   the Company's Form 10-Q for the quarterly period ended June 30, 2010, signed by Defendants Cai and Song.

174.   Each of the statements made by defendants Li, Song, Fan, Yihong and Cai were materially false and misleading because the financial statements, and other financial information included in the above specified Company SEC filings, did not fairly present in all material respects the financial condition, results of operations and cash flows of China-Biotics and were thus filed not in compliance with GAAP.  Financial statements not in compliance with GAAP are presumed to be misleading.  SEC Regulation S-X, 17 C.F.R. § 210.4-01.

175.   In order to "present fairly" the financial condition, results of operations and cash flows, the:

(a)     accounting principles were required to be appropriate in the circumstances;

(b)     financial statements, including the related notes, were required to be informative of matters that may affect their use, understanding, and interpretation; and

(c)     financial statements were required to reflect the underlying events and transactions in a manner that presented the financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements (AU Section 411).

176.    The above particularized financial statements which were disseminated to the investing public during the Class Period were not presented "fairly" because, as particularized above, the:

(a)     accounting principles used by the Company to recognize revenue and inventory were not appropriate in the circumstances;

(b)     financial statements, including the related notes, were not informative of matters (such as the Company's material inflation of revenue, earnings, cash and inventory) that affected their use, understanding, and interpretation; and

(c)     financial statements did not reflect the underlying events and transactions in a manner that presented the financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, limits that were reasonable and practicable to attain in financial statements.

177.    At all relevant times the Individual Defendants knew that each of the financial statements particularized above did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company.

178.    Defendants, in issuing their certifications, as specified above, knew that by doing so they were engaging in a fraud.

179.    In the introductory portion of Accounting Series Release No. 173, the SEC stated that "it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations." As specified above, the overall impression created by each of the Company's financial statements during the

58

Class Period were inconsistent with the business realities of the company's financial position and operations.

180.     Each of the Company's filings on Forms 10-Q and 10-K during the Class Period contained a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") which required management "to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."  (Securities Act Release No. 6835).

181.     SEC Staff Accounting Bulletin No. 104, drawing from Regulation S-K, Article 303, and Financial Reporting Release No. 36, also reiterated the importance of MD&A in financial statements:

> MD&A requires a discussion of liquidity, capital resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release No. 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

182.     As particularized above, Defendants knew that the Company's filings with the SEC on Forms 10-Q and 10-K during the Class Period failed to give investors an opportunity to look at the registrant through the eyes of management.  Accordingly, in addition to their violations of the securities laws through their course of conduct, Defendants also violated GAAP.

## VIII.   UNDISCLOSED ADVERSE INFORMATION

183.   The market for China-Biotics' securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, China-Biotics' securities traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and the other members of the Class purchased or otherwise acquired China-Biotics' securities relying upon the integrity of the market price of China-Biotics' securities and market information related to China-Biotics, and have been damaged thereby.

184.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of China-Biotics' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

185.   At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about China-Biotics' business, prospects and operations.

186.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of China-Biotics and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted

in Lead Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## IX.   SCIENTER ALLEGATIONS

187.   As alleged herein, the Exchange Act Defendants acted with scienter in that the Exchange Act Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

188.   As set forth herein, the Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding China-Biotics, their control over, receipt and/or modification of China-Biotics' allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning China-Biotics, participated in the fraudulent scheme alleged herein.

189.   The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## X.   LOSS CAUSATION

190.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of China-Biotics' securities and operated as a fraud or deceit on Class Period purchasers of China-Biotics' securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and

fraudulent conduct were disclosed and became apparent to the market, the prices of China-Biotics' securities fell as the prior inflation came out of the Company's stock price.  As a result of their purchases of China-Biotics' securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss.

191.    By failing to disclose the true state of the Company's business prospects and growth strategy, investors were not aware of the true state of the Company's financial status.  Therefore, Defendants presented a misleading picture of China-Biotics' business and prospects.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused China-Biotics to conceal the truth.

192.    Defendants' false and misleading statements, including statements regarding the SPO, had the intended effect and caused China-Biotics' common stock to trade at artificially inflated levels throughout the Class Period.  However, as inflation was taken out of the price due to the effects of Citron's revealing report, China-Biotics' common stock price fell multiple times, including approximately $2.66 per share to close at $12.03 on August 30, 2010.  In addition, China-Biotics' stock price continued to fall thereafter as additional information concerning Defendants' fraud came to light, including the following drops:  (a) $0.88 per share to $12.32 on September 1, 2010; (b) $1.40 to $10.65 on September 7, 2010; (c) $0.82 per share to $9.60 on September 21, 2010; (d) $0.96 per share to $12.84 on November 9, 2010; (e) $3.51 per share to $14.16 on January 21, 2011; (f) $1.27 per share to $12.01 on February 16, 2011; (g) $1.30 per share to $9.82 on March 11, 2011; and (h) $1.01 per share to $8.01 on March 16, 2011.  This series of drops caused real economic loss to investors who purchased the Company's securities during the Class Period.

193.    The decline in the price of China-Biotics' common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of China-Biotics' common stock price decline negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of China-Biotics' securities and the subsequent decline in the value of China-Biotics' securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

194.    At all relevant times, the market for China-Biotics stock was an efficient market for the following reasons, among others:

a.    China-Biotics securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.    As a regulated issuer, China-Biotics filed periodic public reports with the SEC and the NASDAQ;

c.    China-Biotics securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.  China-Biotics regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

195.    As a result, the market for China-Biotics securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in China-Biotics' stock price.  Under these circumstances, all purchasers of China-Biotics securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## XII.   CLASS ACTION ALLEGATIONS

196.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired China-Biotics securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of China-Biotics and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

197.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, China-Biotics securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "CHBT".  As of June 7, 2010, the Company had

approximately 22.37 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by China-Biotics and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

198.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

199.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

200.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of China-Biotics;

d.    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of China-Biotics;

e.      whether the market price of China-Biotics common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

201.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XIII.   COUNTS AGAINST THE EXCHANGE ACT DEFENDANTS

### COUNT I
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants**

202.    Lead Plaintiffs repeat and reallege the allegations set forth above, except for those in the Securities Act portions of this complaint, as though fully set forth herein.  This claim is asserted against the Exchange Act Defendants.

203.    During the Class Period, China-Biotics and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of China-Biotics common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase China-Biotics stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and

course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

204.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for China-Biotics securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Exchange Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of China-Biotics, as alleged herein.

205.    In addition to the duties of full disclosure imposed on the Exchange Act Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

206.    China-Biotics and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects

of China-Biotics as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of China-Biotics' value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about China-Biotics and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of China-Biotics' securities during the Class Period.

207.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

68

208.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing China-Biotics' operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

209.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of China-Biotics securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of China-Biotics shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by these Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired China-Biotics securities during the Class Period at artificially inflated high prices and were damaged thereby.

210.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of China-Biotics, which were not disclosed by the Exchange Act Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired China-Biotics securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

211.    By virtue of the foregoing, China-Biotics and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

212.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

213.    Lead Plaintiffs repeat and reallege the allegations set forth above, except for those in the Securities Act portions of this complaint, as if set forth fully herein.  This claim is asserted against the Individual Defendants.

214.    The Individual Defendants were and acted as controlling persons of China-Biotics within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or

indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

216.    As set forth above, China-Biotics and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.    REQUEST FOR RELIEF

WHEREFORE, Lead Plaintiffs, jointly and on behalf of the Class, pray for judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Lead Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

    c)      Awarding Lead Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

    d)      Awarding such other relief as this Court deems appropriate.

## XV.   JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated: April 25, 2011

LAW OFFICES OF CURTIS V. TRINKO, LLP

By: *Jennifer Traystman*

Jennifer Traystman (JT-7583)
Curtis V. Trinko (CT-1838)
16 West 46th Street, 7th Floor
New York, NY 10036
Tel:  (212) 490-9550
Fax:  (212) 986-0158
Email:  Ctrinko@trinko.com

*Liaison Counsel for Lead Plaintiffs John Hill and
Nureddin Nejim*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
Christopher S. Jones (CJ-4131)
Lester R. Hooker
2424 North Federal Highway
Suite 257
Boca Raton, FL 33431
Tel:  (561) 394-3399
Fax:  (561) 394-3082

**RYAN & MANISKAS, LLP**
Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Tel:  (484) 588-5516
Fax:  (484) 450-2582
*Co-Lead Counsel for Lead Plaintiffs John Hill and
Nureddin Nejim*

72